ST. LOUIS, IRON MOUNTAIN & SOUTHERN RAILWAY COMPANY AND VIRGINIA BRIDGE & IRON COMPANY v. YATES.

Opinion delivered February 16, 1914.

1. MASTER AND SERVANT—SPECIAL SERVICES—LENDING SERVANT.—One who is the general servant of one master, may be lent or hired to another for some special service, so as to become, as to that service, the servant of that third party. The test is whether, in the particular service which the servant is engaged to perform, he continues liable to the direction and control of his master, or becomes subject to that of the party to whom he is lent or hired. (Page 498.)

2. MASTER AND SERVANT—INJURY TO SERVANT—DUTY TO FURNISH SAFE
   PLACE TO WORK—DUTY TO WARN OF DANGER.—Plaintiff was injured
   while performing a duty that he had been directed to perform,
   and was injured by the sudden starting of machinery without
   any warning being given him. *Held*, that where plaintiff was sent
   to a place to work which was not dangerous, so long as there was
   no change in the conditions under which he worked, that the
   master was under a duty not to change the conditions, so as to
   render the place dangerous, without first notifying plaintiff, pro-
   vided, however, that it appear that plaintiff, because of his ignor-
   ance of the master's method of work, did not know that the place
   where he was employed would become dangerous by the unex-
   pected starting up of machinery, of which he had no notice. (Page
   500.)

3. MASTER AND SERVANT—INJURY TO SERVANT—CONTRIBUTORY NEGLI-
   GENCE.—Where plaintiff was employed to floor over a machinery
   pit, and was injured by the sudden starting of the machinery, after
   he had placed his foot in a dangerous position; *held*, that if plain-
   tiff knew, or ought to have known, that the machinery was likely
   to move at any time without notice, and notwithstanding he placed
   his foot in a dangerous position and was injured, he is guilty of
   contributory negligence and can not recover.    (Page 500.)

4. MASTER AND SERVANT—INJURY TO SERVANT—CONTRIBUTORY NEGLI-
   GENCE.—Where there are two ways in which a servant may per-
   form his work, and either method appears reasonably safe, but
   the one selected proves more dangerous, the servant will not be
   held guilty of contributory negligence as a matter of law. (Page
   501.)

5. MASTER AND SERVANT—INJURY TO SERVANT—DUTY TO WARN OF DAN-
   GER.—A master can not excuse itself from liability, where it directs
   its servant to do work in a certain place, and the servant is in-
   jured by the act of another servant, who was ignorant of his
   presence.    (Page 501.)

Appeal from White Circuit Court; *Joseph M. Stay-
ton*, Special Judge; reversed as to Bridge and Iron Com-
pany; affirmed as to Railway Company.

STATEMENT BY THE COURT.

The complaint in this cause alleged that the plain-
tiff, Richard A. Yates, was employed by the St. Louis,
Iron Mountain & Southern Railway Company on the 11th
day of April, 1912; that the said railway company had
employed the defendant, Virginia Bridge & Iron Com-
pany to do certain construction work in building a bridge,

near Judsonia, Arkansas, and that the plaintiff was employed by the said railway company at the sum of $2.65 per day to work as a carpenter upon said bridge, and he was ordered and sent by the foreman, in charge of the work for the said railway company, to go to a gearing pit and do certain work there, and that while he was so engaged in the discharge of his duty, and in the exercise of due care, the agents and employees of the said defendants, Virginia Bridge & Iron Company, and the St. Louis, Iron Mountain & Southern Railway Company, knowingly, negligently, carelessly and without warning, started the machinery in motion and caused a cog wheel about which the plaintiff was working to revolve with great rapidity, and caught the plaintiff's foot in these wheels and so mangled it that it had to be amputated. He prayed judgment in the sum of $25,000. The railway company answered and denied all the material allegations of the complaint, and alleged that plaintiff's injury was caused by his own contributory negligence. The defendant bridge company, in its answer, denied all the material allegations of the complaint, and alleged that the plaintiff's injury was caused by his own contributory negligence, and denied plaintiff was injured by reason of any machinery either negligently or carelessly started by any servant in its employ.

The service of summons was shown to have been had upon the Virginia Bridge Company, and a motion to quash the summons was filed upon that account. Proof was offered upon this motion to the effect that there was no such corporation as the Virginia Bridge Company, and that service had, in fact, been had upon the agent of the Virginia Bridge & Iron Company; and that that company had prepared for trial. The court overruled the motion to quash the summons, and permitted the sheriff to amend his return, showing that proper service had been had, and we think he committed no error in so holding; but we do not set out in detail the evidence heard by the court on this motion, which covers many pages of the record in this case, because, for reasons which will be

hereafter stated, we do not think there is any liability on the part of the bridge company, and we have for that reason dismissed the cause as to it.

The evidence in the cause shows that the railroad company had purchased from the bridge company the material with which to construct a bridge across Little Red River near Judsonia, Arkansas, and that the contract for its construction had been let to the Kansas City Construction Company, a separate corporation, and that the bridge had been completed and examined by the engineers representing the railway company, and accepted by them. But it was found that certain machinery in connection with the bridge did not work properly, and the bridge company was notified of that fact, and requested to send an expert to the scene to put the bridge in proper shape. In response to this request, the bridge company sent a Mr. Claus, who testified that he was paid by the Virginia Bridge & Iron Company for his services, and that he was sent by that company with directions to report to the railroad company upon his arrival, and that he reported to the chief engineer of the railroad company who told him to go ahead with the work and to test out certain machinery, and to put it in proper working condition; and he testified that he was working under the directions of the railroad company, and could do nothing without their authority. It appears that while the bridge company paid the wages of Claus, and two men employed by him, that an account was kept of these sums, and the same was charged back to the railroad company.

The facts in regard to the injury of appellee are substantially as follows:

The bridge did not operate satisfactorily in this, that the wedges at the end of the bridge which had to be pulled, when the bridge was turned, and had to be driven back after the bridge was replaced, were both difficult to pull in the first instance, and to drive back in the second, so that trains were often delayed and the traffic at times congested.

The evidence further shows that at the center of the bridge, and over and above the structure there, and under which the trains were operated, there was a tower, the window of which was twenty-six feet above the base of the bridge; that in the tower is located the machinery which, when set in operation, pulls and drives the wedges at either end of the bridge; that the bridge was 260·feet long and that it was 130 feet south of the pit in which appellee was working at the time he was injured; and that it was impossible for one located in the tower where Mr. Claus was, at the time he set the machinery in motion, to see a person in or about the pit where the appellee was, and that Mr. Claus had been at work on the bridge pulling and driving the wedges many times every day since some time in February, and that during all this time no one had ever gone into the pit at either end of the bridge, except Mr. Claus and the two men working under him. During this time Mr. Claus went into the pit when it was necessary for the purpose of cleaning, greasing and adjusting the machinery, which was in the pit, and which was a part of the machinery for drawing and driving the wedges; that during this time the pit had remained uncovered, that is, it had no top or covering over the machinery in this pit, and it had no floor underneath; that until the work which Mr. Claus was to do had been completed, he and the two men working under him found it necessary to go into this pit almost daily, and for this reason it had been more convenient not to have any covering over the pit, and Claus testified that he did not know it would be covered until he had finished the work of adjusting the machinery.

P. C. White testified that he was the foreman of the gang, and that appellee was employed under him as a bridge carpenter, and that he had directed him and another employee to go into the pit and take certain measurements, which were necessary to be made in order to make a covering for the pit. That there was one pit at the north end of the bridge, and another at the south end, and that in order for the men to perform this work

it was proper for them to go into the pit, and it was the natural place for them to go. That the measurements could have been taken without going into the pit, but that they could get them better in the pit. That after he put Yates and Boyer in the pit at the north end of the bridge, he put two other men to work in the pit at the south end of the bridge, and that altogether, there were about twenty men at work on the bridge.

A witness named A. Bunch testified that at the time Yates was injured, "I was about fifty feet from him, and was putting down guard rails. There was no warning given that the machinery was going to start. It had been customary to give signals or warnings prior to the time they were going to start the machinery. I do not know whose business it was to give that warning. There was a man there who gave signals; his name is Harvey Blaylock. He gave me warning one time. I understood from Blaylock he was there for the purpose of giving signals, when the machinery was about to be turned. He did not say he would give me the signals, but that he give Claus signals when to start." And the witness further testified:

Q. And you say that up to this time, when you workmen were working around the place of danger, that Blaylock had been giving signals to Claus, the man that set this machinery in motion, when it was safe to start it?

A. I know that he has done it. Blaylock was where he could give Claus signals, when to start and stop the machinery.

Q. Was not the purpose of Blaylock's giving these signals to guard against having the bridge in a condition that it was not safe to receive trains?

A. I do not know.

Q. Then you do not know whether that was his purpose there or not?

A. That was one of his purposes. That is not the only danger; there are other cogs; they are all under the bridge; none of them are on top where we were working; we had not been under the bridge, and were above the

danger. There was danger working around the shoes on top of the bridge.

Q. If the engine was not running, there would be no danger?

A. The machinery does not move every time the engine runs.

Q. But if the engine was not running, there would be no danger?

A. No, sir.

A. W. Boyer testified that under the directions of Mr. White, foreman, he was assisting appellee in putting in a platform over the cog wheels on the bridge, and they had been working some four or five minutes when the accident happened. They were taking measurements of the timbers, and were in the pit performing this work, which was the proper place for them to be. That Yates got through first, and was coming over to help the witness, and the machinery was not running at that time, and that just as Yates stepped on the cog wheels, the wheels turned and caught his leg. The witness was asked this question:

Q. From where he was, could he have gotten over to take these measurements and perform the work, that he had been directed to perform, without stepping on these wheels.

A. No, sir.

He further stated that the wheels make about 250 revolutions a minute, and that witness had never worked in a pit before, and had never seen any one else working in it, and that Yates had never worked there until that morning and no one gave them warning of the danger of the cog wheels, while performing this work; and that they had been in the pit only a few minutes when Yates was hurt, and that they had no warning that the machinery above was being connected with these cog wheels to turn them. He was asked the following questions:

Q. You did not notify the man in the tower that you were going into the pit to work?

A. No, sir; he knew I was in there.

Q.  How do you know he did?

A.  He passed by there before we started to work. He saw we were getting ready to go to work.

The appellee testified that he was directed by his foreman to put a floor over the pit which was about six feet wide, and he details his injury as follows: "We received directions from White to make a certain cut. I got a 2x10 and went to see if it would fit, and when I started to go around Mr. Boyer to fit it, I stepped on the wheel and got hurt. I was taking this measure for the joists, that were to go across the pit to put the floor on. I was going to put these pieces in sections, a joist from each side to meet in the center. I got in the pit in order to take the measurements accurately. As I went to get around Mr. Boyer, I started to step on or over here on this place, and it was most too far for me, and I stepped on the gearing, and just as I stepped on it, it started and caught my foot. I stepped on the gearing to get on the other side to get the measurements, and thought it was proper to get into the pit to do this work, and I was doing it as it should have been done. I do not see how it could have been done without getting into the pit. I never did any work in or around the pit before, and had no instructions from White, or any one else, with reference to the machinery in the pit, and it was not in motion when I went in. I could have crossed there without stepping on the wheels, possibly. I had never seen any cog wheels running, and did not know whether it started quick or not. It started like a flash, when the machinery ground my leg off near the knee."

The witness admitted that he saw the cogs and knew that it would be dangerous to step upon them, while they were in motion, and admitted that he knew the machinery, used to set the cogs in motion, had been running for some time, and he knew the cogs could be started at any time, but he says that he did not know that they were likely to be started without giving him notice. He admitted that he could have crossed over the pit with safety, without coming in contact with the cogs, but he

said that the easiest, quickest and most natural way to cross the pit was by stepping on the cogs, and that there was no danger in doing so, unless the wheels were set in motion.

Mr. Claus testified that he got to the bridge at 7:30 on the morning of the injury, which happened about ten minutes after he got there; that he saw the bridge carpenters at work on the bridge, where they had been at work for about two weeks, but that no one gave him any notice that these men were going into the pit, or that they were in the pit, and he had no idea any one was in there. That he had never known of any one, except himself and his two helpers, to go into the pit, and they had gone there only for the purpose of oiling this machinery, and that no one else ever had any business in the pit. That he could not see in the pit from where he was. He says the only signals, which were ever given him, were for the purpose of advising him of the approach of trains so that the bridge could be put in position for the trains to cross over the river.

Numerous instructions were asked, and a number were given, at the instance of both appellants, as well as at the request of the appellee, and of those given at the request of the appellee, the two following instructions are said to be erroneous. They read as follows:

1. "You are instructed that it was the duty of the railway company to use ordinary care in furnishing the plaintiff a reasonably safe place to perform his work, and, if you believe from the testimony in this case, that the defendant railway company failed to use ordinary care to furnish such safe place to work, and that the plaintiff was thereby injured, then he would be entitled to recover, as to the defendant railway company, unless you further find from the evidence that he was guilty of contributory negligence which proximately contributed to his injury."

2. "You are instructed that if you believe from the evidence that the plaintiff was inexperienced as to the machinery in the gearing pit, and did not know or appre-

ciate the danger of his employment, in and about such gearing pit, on account of his inexperience, and that the defendant knew, or, in the exercise of ordinary care, should have known, of his inexperience in regard to such work at such gearing pit, and that it could have prevented his injury by warning him of the danger and hazards incident to working in and about such gearing pit, then it was the duty of the defendant railway company to give the plaintiff such warning; and if it failed to do so, and the plaintiff was thereby injured, then the defendant railway company would be guilty of negligence, and the plaintiff would be entitled to recover, unless you believe from the evidence that he was guilty of contributory negligence.''

And it is also urged that the court erred in refusing to give the sixth instruction requested by the railway company, which reads as follows:

''You are instructed that if you find from the evidence in this case that the plaintiff could have moved about in the pit, where he was engaged at work, without putting his foot in a place of danger, and that he either voluntarily or carelessly placed his foot in a dangerous position, when he could have avoided his injury by using other means at hand for the purpose of performing his work, then the plaintiff can recover nothing in this action, and your verdict should be for both of the defendant companies.''

*E. B. Kinsworthy, P. R. Andrews* and *T. D. Crawford*, for appellant railway company.

1. Appellee's work consisted in making a dangerous place safe. Instruction 1 had no application to the facts, and was misleading. 76 Ark. 69; 4 Thompson on Neg., § 4705.

2. The second instruction erred in assuming that there was evidence that appellee, on account of inexperience, did not know of the danger of stepping on the cog wheels. It was abstract and misleading.

3. The sixth instruction requested by the railway

company properly submitted the issue of contributory negligence, and should have been given.

It is error to refuse to give a specific instruction correctly applying the law to the facts in a case, even though the law, in a general way, is covered by the charge given. 76 Ark. 227-232.

4. No case of negligence on the part of this appellant is shown. On the contrary, appellee's contributory negligence is established by his own testimony. The case should be dismissed. 100 Ark. 156.

*Bradshaw, Rhoton & Helm,* for appellant, Virginia Bridge & Iron Company. ·

1. No liability on the part of this appellant is shown. Claus was loaned to appellant railway company, was at the time of the accident in charge of the bridge in question, and was acting under the directions and by the authority of that company. Although this appellant was paying his salary and the salary of those under him, yet this in turn was charged back to the railway company. The liability, if any is shown, is that of the railway company. 152 S. W. (Ark.) 149; 77 Ark. 554; 3 Elliott on Railroads, 1586, § 1063; 69 N. E. 1078; 137 N. Y. 248-257.

2. The evidence is clear and conclusive that appellee was guilty of such contributory negligence as to bar his right to recover. 93 Ark. 153; *Id.* 484. ,

*S. Brundidge* and *J. W. & J. W. House, Jr.,* for appellee.

1. Instruction 1, objected to by appellant railway company, is so well established as the law applicable to the facts developed in this case, as almost to be classed as elementary. 90 Ark. 227, and cases cited; 58 Ark. 168; 103 Ark. 618; 81 Ark. 591; 54 Ark. 289; 77 Ark. 290; 103 Ark. 618.

2. There was no error in instruction 2. It is a universal doctrine applied to inexperienced servants as well as to minors, that when one is put to work at a place where he has had no experience, it is the duty of the mas-

ter to warn him of the danger. 90 Ark. 227; 58 Ark. 168; 103 Ark. 618; 95 Ark. 291; 72 N. E. 955; 73 Ark. 49-55; 56 Ark. 232; 78 Ark. 147; 78 Ark. 100.

3. Instruction 6, requested by appellant railway company, was very properly refused. Because a party chose a way to perform a duty which proved to be dangerous, where there were several ways to perform that duty, such choice is not sufficient to hold him guilty of negligence as a matter of law. The question here is whether or not appellee was in the exercise of ordinary care.

4. As to the appellant, Virginia Bridge & Iron Company, we think the evidence is sufficient to establish its liability.

(1) Claus was a servant of this appellant at the time Yates was injured. The Virginia Bridge & Iron Company occupied the position of an independent contractor, in that it undertook to correct the defects in the bridge, sent Claus there for that purpose, he to determine what was necessary to be done, and to do the work needed to correct the defects. He was to use his own methods to accomplish it. He did not represent the railway company even as to the result of his work or as to its construction or repairs. 77 Ark. 551-553.

(2) There is ample evidence that Claus was negligent, not only in failing to have some one below to notify him of the approach of trains, and to notify them when any of the bridge gang were in danger, but also in starting the machinery sooner than customary and without waiting for a signal to start it. 77 Ark. 290.

(3) Where there are two ways in which a duty may be performed by a servant and the one selected proves more dangerous than the other, he is not guilty of contributory negligence as a matter of law. 103 Ark. 618; 101 Ark. 204.

SMITH, J., (after stating the facts). We think the evidence clearly shows that at the time of the injury, Claus was merely loaned by the Virginia Bridge & Iron Company, his general employer, to the railroad company,

and, although he received his salary directly from the bridge company, he was in fact in the service of the railway company, and that even the wages which he and his helpers received were charged back to the railroad company. In the case of *Wylie et al.* v. *Palmer et al.*, 137 N. Y. 248, it was said: "The fact that the party, to whose wrongful or negligent act an injury may be traced, was at the time in the general employment and pay of another person, does not necessarily make the latter the master and responsible for his acts. The master is the person in whose business he is engaged, at the time, and who has the right to control and direct his conduct. The rule on this subject is well stated by a learned author on the law of negligence as follows: 'He is to be deemed the master who has the supreme choice, control and direction of the servant, and whose will the servant represents, not merely in the ultimate result of his work, but in all its details. The payment of an employee by the day, or the control and supervision of the work by the employer, though important considerations, are not in themselves decisive of the fact that the two are master and servant. * * * Servants who are employed and paid by one person, may, nevertheless, be *ad hoc* the servants of another in a particular transaction, and that, too, where their general employer is interested in the work. They may, without consulting their master, but in good faith, assist a person independently employed to do something which shall benefit their master, but with which neither he nor they have any right to interfere, and in which they act entirely under the control of such other person. In none of these cases is the nominal master responsible to strangers for their acts or omissions.'" Sherman & Redfield on Negligence (4 ed.), 269.

The question of special service was recently considered in the case of *Arkansas Natural Gas Co.* v. *Miller*, 105 Ark. 477, and the authorities were there reviewed, and the following language was quoted with approval from the case of *Coughlan* v. *Cambridge*, 166 Mass. 268; "It is well settled that one who is the general servant of

another, may be lent or hired by his master to another for some special service, so as to become, as to that service, the servant of such third party. The test is whether, in the particular service which he is engaged to perform, he continues liable to the direction and control of his master or becomes subject to that of the party to whom he is lent or hired.''

Instructions numbered 1 and 2, given at the request of appellee, may be discussed together. Appellant says appellee was employed to make a dangerous place safe, and that this was therefore one of the exceptions to the rule which requires that care be used to furnish a reasonably safe place, and that the second instruction is erroneous because it assumes that there was evidence that appellee did not know of the danger of stepping on the cog wheels, and that the instruction was abstract and misleading in that appellee's testimony showed that he knew these cog wheels were likely to move at any moment, and that they were liable to injure him. It is admitted that these instructions announce correct declarations of law, but it is said they are abstract. We do not think the instructions are abstract, but it does appear that the second instruction does not accurately fit the issues of fact submitted to the jury. Appellee was not engaged in making a dangerous place safe, but he was merely preparing to cover the pit to protect the machinery therein from weather. The place was not dangerous, when the servant entered it to perform his labor, and would not have become so had the machinery not been started. This first instruction permits a recovery if the jury finds the railway company failed to exercise ordinary care in furnishing a safe place, unless appellee was guilty of contributory negligence. The case was tried upon the theory that a safe place was made dangerous, by an act of the master of which the servant had no notice. If this second instruction told the jury that the railway company was under any duty to warn appellee, on account of his inexperience, that the cog wheels were dangerous, if the machinery was put in motion, it would

be erroneous and prejudicial, because appellee needed no such warning, and appellant was under no obligation to give that warning. What we understand these instructions to mean, when read together, and in connection with all the other instructions in the case, is that if appellee was directed to a place where, by the exercise of ordinary care, he might safely work, so long as there was no change in the conditions under which he worked, that these conditions should not be changed, so as to make the employment dangerous, without advising him that this change had taken place, or might take place, provided the jury found that appellee, because of his ignorance of appellant's method of work, did not know that the place where he was employed would become dangerous by the unexpected starting up of machinery, of which he had no notice. Appellee testified he had been away from the bridge for several days before his injury, and had only returned to the job that morning, and was injured a few minutes after he began work, and that he did not know there was any danger of the machinery starting up without warning being given. And these instructions submit that question to the jury, but in a very unhappy manner. However, as has been stated, the court gave, at the request of appellants, instructions which clearly defined the duty in regard to furnishing a safe place to work and the duty to give warning. There were many of these instructions, and, without setting them out in full, it may be said that their purport was, that if appellee knew, or ought to have known, that the cog wheels were liable to turn at any time without notice to him, and that notwithstanding such knowledge he placed his foot in a dangerous position, and was injured thereby, he would be guilty of contributory negligence, and could not recover.

As has been stated, the court refused to give defendant's sixth instruction, set out in the statement of facts, and we think this instruction was properly refused. This instruction declares it to be negligence, if one voluntarily or carelessly does an act which results in his injury when

he could have avoided the injury by using other means at hand for the purpose of performing his work. But "this court has held that where there are two ways in which a duty may be performed by the servant, and the one selected proves less safe than the other, the servant can not be held guilty of contributory negligence as a matter of law." *Sligo Iron Stove Co.* v. *Guist,* 103 Ark. 627. But this rule, of course, would apply only where either method appeared to be reasonably safe, but the one selected proved to be more dangerous than the other method would have been.

It is of no defense that Claus did not know of appellee's presence in the pit, when he set the machinery in motion, provided the railroad company was under the duty of advising him that this might be done, without warning. In the case of *St. Louis, I. M. & S. Ry. Co.* v. *Harmon,* 85 Ark. 503, it was said: "The plaintiff went into the caboose under the direction of his superior. He was rightfully there, and was entitled to the exercise of ordinary care for his protection. His employer could not put him in a place of danger, and ignore his presence there. It owed him the duty of protection, and could not escape liability on account of failure to perform that duty, merely by showing that the particular servant whose act caused the injury did not know of his presence." See, also, *St. Louis, I. M. & S. Ry. Co.* v. *Baker,* 110 Ark. 241.

It is not claimed that the verdict is excessive, and upon the whole case we think the cause was fairly tried, and the judgment of the court below will be affirmed as to the railroad company, and dismissed as to the bridge company.

WOOD, J., (dissenting). Instruction No. 2, given at the request of appellee, was abstract, therefore erroneous, and, in my opinion, was clearly prejudicial to appellant railway company. The framers of this instruction evidently had in mind, the doctrine often announced by this court, "that where a servant, by reason of his inexperience, is not aware of, or does not appreciate the dangers

of the work he is employed to do, or to the place he is engaged to occupy, it is the duty of the master to give him such instructions and caution as would in the minds of men of ordinary understanding, be sufficient to enable the servant to appreciate the dangers. *Emma Cotton Seed Oil Co.* v. *Hale,* 56 Ark. 232-238.

But that doctrine has no application here, for the reason that appellee himself testified in part as follows:

"I had been in the service of the railway company in the bridge and building department, for five years. I had been working on this bridge for two or three weeks, except three days that I was sick: On the morning that I went to this pit, Mr. White had told me and Mr. Boyer to go there and take these measurements. He went with us over to the pit, and told us what measurements were to be taken. He did not give us any specific directions, but just told us to go do this work. We then selected the manner in which we should do the work, and did the work to suit ourselves. He was not present at the time of the accident. He did not tell me to go into the pit. I knew the situation and surroundings, and knew what was necessary to be done for preparing to cover the pit, and picked out my own way and method of doing the work. Before I got in the pit, I heard the engine running in the tower above. I knew that the engine would start and turn this machinery a good many times each day. I knew that it was running to test this machinery, and that it would run a while and stop a while. I knew that these cogs turned in the pit, when the machinery was in operation. I could see the cog wheels, and saw them turn. I knew that they were connected with this engine, and that when the engine was running, by pushing a lever, the cogs would be set in motion. They were uncovered and exposed to the eye, where they were easily seen."

This testimony by appellee shows conclusively that he was not an inexperienced servant, that he absolutely knew and appreciated the dangers incident to the work he was doing. Appellant railway company was therefore

under no duty to instruct him as to those dangers, and was not negligent in failing to so instruct him.

The appellee does not charge negligence in this respect in his complaint, and certainly his own evidence would negative such a charge had it been made. The rule established by this court and the authorities generally is, that when an instruction is abstract and erroneous, the giving of it is reversible error unless it clearly appears that no prejudice could have resulted.

To my mind it is obvious that prejudice could have resulted and did result. There was no other instruction given on this subject. The other instructions had reference solely to the duty of appellant railway company to warn appellee when the machinery would be put in motion, and to warn the engineer of the fact that appellee was working in the pit.

The instruction brought into the case an entirely new issue, and one that appellee's own evidence disproves. Yet the attorneys for the appellee might have argued, before the jury, that the court had told them that they could find that it was appellant's duty to instruct appellee as an inexperienced servant, of the dangers incident to the work he was doing, and the machinery about which he was working, and was negligent if it had not done so. The jury could not, under their oath, have disregarded such instruction. Who can say that the verdict was not based upon it. It is difficult to conceive of an abstract instruction more misleading. It was therefore prejudicial. See *Johnson* v. *Pennington,* 105 Ark. 278; *Emerson* v. *Turner,* 95 Ark. 597; *District Grand Lodge No.* 11 *Endowment, etc.* v. *Pratt,* 96 Ark. 614. No such issue should have been introduced.

I therefore dissent from the judgment as to the appellant railway company, and for the error in giving appellee's prayer for instruction No. 2, the judgment should be reversed and a new trial granted.