BARTON-MANSFIELD COMPANY *v.* BOGEY.

4-6194 147 S. W. 2d 977

Opinion delivered February 10, 1941.

*Poe & Wood,* for appellant.

*Hopson & Hopson,* for appellee.

HOLT, J. A scaffold on which appellee, John Bogey, was standing while repairing the roof of appellant's lumber shed fell and he sued jointly, appellant, Barton-Mansfield Company, a corporation, and Calvin Carter, an employee, to recover damages in the sum of $8,000 to compensate for injuries alleged to have been sustained by him.

The negligence of appellant lumber company and Carter, its employee, alleged in appellee's complaint was that Calvin Carter stacked against the scaffold upon which appellee was standing more than "three times" the amount of lumber necessary to complete the repair of the roof upon which appellee was engaged thereby causing the scaffold to collapse and seriously injure appellee.

It was further alleged "that at the time the scaffold collapsed, and prior thereto, the plaintiff was standing near the north end, and in a position from which he could see neither the defendant, Calvin Carter, nor the amount of lumber that had been piled against said scaffold."

The lumber company and Carter filed separate answers denying every material allegation in the complaint, and specifically pleading assumption of risk and contributory negligence and that appellee was an independent contractor.

Upon a trial to a jury there was a verdict in favor of defendant, Calvin Carter, and a separate verdict

against appellant, lumber company, in the sum of $3,000. From the judgment against it, the Barton-Mansfield Company has appealed.

Stating the testimony in its most favorable light to appellee, as we must do, the record reflects that John Bogey, appellee, 56 years of age and a carpenter and contractor of some 18 years' experience was employed September 4, 1939, by appellant through its manager, C. D. Miller, for the special service of repairing the roof of appellant's lumber shed. For this work he was to receive 50c per hour, or $5 per day, and was to select a helper at 20c per hour, or $2 per day. Appellee selected "Bubba" Durain as helper and his services were paid for by appellant through a check payable to appellee, who in turn paid Durain.

Before beginning the work on the roof, appellee and his helper, Durain, for their convenience, built the scaffold in question from lumber which they selected from appellant's stock. This scaffold was approximately 35 feet in length, seven feet high and about three feet from the roof. It was divided into three sections, with only the extreme left section cross-braced, the center and right sections having a line brace for their support. Appellant had nothing to do with the construction of this scaffold.

Calvin Carter and Aubrey Bogey (appellee's son) were employees of appellant stacking and arranging lumber and doing other odd jobs about the yard.

During the progress of the repair work on the roof, appellee directed his son Aubrey and Carter to bring him some 10 or 12 pieces of shiplap boards about 14 feet in length. This they proceeded to do with the aid of a truck. They brought, however, 30 or 35 pieces of lumber. After Aubrey Bogey had placed 10 or 12 pieces of this lumber leaning against the end of the scaffold at an angle of about 45 degrees, Calvin Carter unloaded the remaining pieces from the truck, placing them against the end of the scaffold with the boards that Aubrey Bogey had unloaded. About five minutes after these

boards had been left leaning against the end of the scaffold, the scaffold collapsed injuring appellee.

On the question of procuring and delivering these pieces of lumber, appellee testified that he said to his son, Aubrey, and Calvin Carter, "Boys get me some lumber," and that he told them it would take 10 or 12 pieces; that his son brought the lumber in a truck and "He stacked it on this 2 x 6. Q. You could see him taking it from the truck, but could you see the lumber? A. Not unless I would have got down on my knees. Q. I mean, did you see the lumber? A. No. That is the only way I could have seen it. Q. Did you see Calvin Carter take any of the lumber from this truck? A. Yes, sir. Q. Could you hear the lumber being stacked against there? A. No, sir, I couldn't. I don't know where he put the lumber. I know he finished unloading. I saw him unload the lumber. . . . A. I was working on that board. I was on right there—on this end when it collapsed. . . . That scaffold went out from under me like a streak of lightning, I guess. Before I thought to catch on anything, we were on the ground. It just went down awfully quick. I had no warning whatever."

Quoting further from appellee's testimony: "Q. Mr. Bogey, what kind of scaffold was that? Was that a substantial scaffold? A. Just as substantial as I ever built, I considered it. . . . Q. Did you see the stack of lumber they had up there? A. I didn't see it until after it hit my feet. Q. How large a stack of lumber was it that fell down, a portion of which hit your feet? A. I presume there was 30 or 35 boards. Q. Was it more lumber than a scaffold of that kind should be used for? A. In my judgment, yes, sir. I wouldn't have let them put it up there if I could have seen what they were doing. I didn't observe it. I certainly didn't. . . . Q. Was there anything said between you and Mr. Miller about the help so far as getting the material to you, or how you were to get that? A. Yes. He says the boys that are out there were going to get me the material I needed. . . . They (meaning Aubrey Bogey and Cal-

vin Carter) had nothing to do with the building of the scaffold or the repairing of the shed, but they were to bring me the material.''

On cross-examination appellee testified: ''I saw them come back, back with the truck. Q. You saw some of the lumber placed out there? A. I saw some of the lumber placed out there, yes, because I pulled up one or two boards afterwards, yes, sir. Q. When did this scaffold fall? A. This scaffold—we got along there and put on four or five of them boards I think— Q. Just let me ask you, where did you get those boards? A. I got them off down here. . . . Q. You knew there was lumber there? A. Yes, sir, I knew—I saw him put—I had been drawing up some from there. . . . Q. Mr. John, 'did Mr. Miller assign Aubrey Bogey and Calvin Carter anything to do in connection with the repairing of the roof? A. In that way, no. . . . Q. Mr. John, you are really your own boss, are you not? A. Well, invariable.''

Eugene Durain, appellee's helper, testified on behalf of appellee (and here we quote a summary of his testimony from appellee's brief) that ''he heard Bogey tell Calvin Carter and Aubrey Bogey to get some lumber; that he and John Bogey were standing on the walk board at the time that the lumber was stacked against the end of the scaffold. He testified that John Bogey stood between him and the north end of the scaffold; that he did see some of the lumber that was stacked against the end of the scaffold, that is, the first boards towards the middle; that he could not have seen all of the lumber stacked there; that the roof would have obstructed their view in seeing more than the first boards that had been placed against the end of the scaffold; that at the time the scaffold fell he and Mr. Bogey were working on the north end; that the reason that the scaffold fell was that the nail in the purline board had pulled out; that the horizontal board upon which the lumber was stacked pulled loose from the post; that the weight of the lumber forced out the nail that held the purline board causing it to collapse; that after the shed collapsed, at

the direction of Mr. Miller, the witness returned and finished the job; and that Mr. Miller paid him.''

Aubrey Bogey testified that his father (appellee) told him and Calvin Carter to get 10 or 12 pieces of 14-foot lumber, but that they got 30 or more pieces because he thought it would be needed; that he stood about 12 boards against the end of the scaffold and that Calvin Carter unloaded the remainder of the boards placing them against the end of the scaffold. He further testified that the scaffold collapsed within five minutes after the last lumber had been stacked against it.

Many errors are assigned. The first is that the trial court erred in refusing appellant's request for an instructed verdict in its favor at the close of all the testimony. Having reached the conclusion that this contention of appellant must be sustained, it becomes unnecessary to consider the other assignments.

The record reflects that appellee, an experienced carpenter and contractor, was employed for the special service of repairing the roof of appellant's lumber shed. While performing this work, he was to receive $5 per day and have an assistant of his own choosing at $2 per day. Materials for the work were furnished by appellant, and appellee had the permission of appellant to call upon two of its employees, Aubrey Bogey (appellee's son) and Calvin Carter, to deliver materials needed in the work. With appellant's consent, appellee, for his own convenience in prosecuting the work, constructed the scaffold which collapsed and injured him. This scaffold was constructed by appellee and his helper under appellee's sole supervision and without any suggestion or interference on the part of appellant. Appellant knew nothing about the strength or weakness of this scaffold. The material that went into it was selected by appellee. Appellant knew nothing about the time when the shiplap boards were delivered to appellee, nor the number that would be necessary for appellee's use. When appellee directed his son and Carter to bring the boards to him, they were under his direct supervision and control in respect of the particular transaction. Where they

should place this lumber for the convenience of appellee was under his absolute control, as was the number of pieces required.

According to this record, appellant had no immediate supervision of the actions of these two employees in executing the order of appellee to procure and deliver this lumber to him while appellee was in the performance of the special service for which he was employed by appellant. The lumber was stacked against the scaffold where appellee could and should have seen it, and he used pieces from this stack before the scaffold fell. Appellee knew that his son and Carter were placing lumber in a leaning position against the end of the scaffold and if they placed more pieces against the scaffold than were necessary, or than it was able to withstand, it was not the fault of appellant, but the fault of appellee who was in charge and who supervised their action.

The general rule applicable to the facts before us is clearly stated in *St. Louis, I. M. & S. Ry. Co.* v. *Yates,* 111 Ark. 486, 165 S. W. 282, where this court said:

"The fact that the party, to whose wrongful or negligent act an injury may be traced, was at the time in the general employment and pay of another person does not necessarily make the latter the master and responsible for his acts. The master is the person in whose business he is engaged, at the time, and who has the right to control and direct his conduct. The rule on this subject is well stated by a learned author on the law of negligence as follows: 'He is to be deemed the master who has the supreme choice, control and direction of the servant, and whose will the servant represents, not merely in the ultimate result of his work, but in all its details. The payment of an employee by the day, or the control and supervision of the work by the employer, though important considerations, are not in themselves decisive of the fact that the two are master and servant. . . .' Shearman & Redfield on Negligence (4 ed.) 269. . . .

"It is well settled that one who is the general servant of another, may be lent or hired by his master to another

for some special service, so as to become, as to that servant, the servant of such third party. The test is whether, in the particular service which he is engaged to perform, he continues liable to the direction and control of his master or becomes subject to that of the party to whom he is lent or hired."

We think whatever negligence, if any, may be attributable to Calvin Carter was assumed by appellee under whose direct supervision and control and for whose special benefit Carter was acting at the time.

For the error indicated, the judgment is reversed, and since the cause seems to have been fully developed, it is dismissed.