ST. JOSEPH'S REGIONAL HEALTH CENTER; Sisters of Mercy Health System, St. Louis, Inc.; and Randall J. Fale *v.* Dr. Louis R. MUNOS, M.D.

95-1217 934 S.W.2d 192

Supreme Court of Arkansas
Opinion delivered November 18, 1996

*Wright, Lindsey & Jennings*, by: *Edwin L. Lowther, Claire Shows Hancock*, and *Anna Hirai Gibson*, for appellants.

*Jess L. Askew III* and *Grace Ann Weber*, for appellee.

DAVID NEWBERN, Justice. Sisters of Mercy Health System, St. Louis, Inc. ("Sisters"), is a Missouri corporation that operates twelve hospitals, one of which is St. Joseph's Regional Health Center ("St. Joseph's") in Hot Springs. St. Joseph's is described as a "member" of the Sisters hospital system. We do not know all the details of the relationship between Sisters and St. Joseph's, but we understand from pleadings and from oral argument that St. Joseph's is an Arkansas non-profit corporation owned by Sisters. Sisters employs Mr. Randall J. Fale to act as chief executive officer and president of St. Joseph's.

In 1989, St. Joseph's formed a partnership with Dr. Louis R. Munos and four other physicians. The purpose of the partnership was to provide magnetic resonance imaging services at a facility operated by the partnership and known as the Hot Springs MRI Center. St. Joseph's owns 51 percent of the partnership, and it appointed Mr. Fale, along with two others, to represent it in the partnership. Dr. Munos owns 19.8 percent of the partnership, and the other four physician partners own varying lesser amounts.

On March 8, 1989, the partnership entered a ten-year agreement with Dr. Munos to manage the MRI Center. The partnership terminated the contract in 1993. Dr. Munos sued the partnership for breach of the contract, Sisters and Mr. Fale for tortious interference with the contract, and St. Joseph's and Mr. Fale for breach of the fiduciary duty between partners. The alleged liability of Sisters and St. Joseph's was derivative, based upon the conduct of Mr. Fale.

The jury returned a verdict upon interrogatories and found that the partnership did not breach the contract but that Mr. Fale and Sisters interfered with the contract and that St. Joseph's and Mr. Fale violated their fiduciary duty to Dr. Munos. The three defendants were held jointly and severally liable for damages of $100,000.

We agree with the argument of Sisters and Mr. Fale that the acts of Mr. Fale resulting in the termination of the contract were taken on behalf of St. Joseph's rather than Sisters. Sisters' motion for directed verdict should have been granted on this point because St. Joseph's, through its membership in the partnership, was a party to the contract in question and could not have interfered with its own contract. We also agree with the argument of Mr. Fale and St. Joseph's that the evidence produced at trial failed to show a breach of the fiduciary duty owed by one partner to another. The directed verdict motion of St. Joseph's and Mr. Fale on the latter point also should have been granted.

As we reverse and dismiss the two parts of the judgment upon which the liability was based, we need not consider Dr. Munos's cross-appeal, which concerns only the amount of damages.

The contract between the partnership and Dr. Munos provided that Dr. Munos, as an independent contractor, would "provide professional radiology and administrative services to the [MRI] Center and ... manage the provision of MRI services at the Center." Dr. Munos agreed to "protect the confidentiality of patient records" and to "comply with all applicable federal, state and local laws and regulations relating to such records." Although the contract was for a term of ten years, the parties agreed that it could be terminated immediately in a "duly called meeting" of St. Joseph's and two of the four physician partners. This termination clause required that Dr. Munos receive notice of the termination, but it did not confer on him the right to be present at the "duly called meeting."

At some point after the partnership was created, St. Joseph's and two of the individual physician partners became involved in medical malpractice litigation. In late 1992 and early 1993, the partners began to question whether Dr. Munos was protecting the confidentiality of patient records at the MRI Center. They suspected information was being "leaked" from patients' records for which there had been no release authorizations. The partners investigated the record-keeping practices of various departments within the St. Joseph's system, and they focused on the MRI Center.

Gary Sammons, an attorney who represented plaintiffs in the medical malpractice actions, was a personal friend of Dr. Munos. He also rented office space from Dr. Munos in a building adjacent to the MRI Center. The partners feared that Mr. Sammons might have ascertained the identities of potential plaintiffs by reviewing

information from patient records at the MRI Center. The allegation that emerged against Dr. Munos was that he had allowed Mr. Sammons into the non-public areas of the MRI Center and had possibly permitted him to view patients' medical records without authorization.

Evidence presented at the trial showed that Mr. Fale met with Dr. Munos on February 9, 1993, and raised these concerns. Mr. Fale stressed the need for patient confidentiality and instructed Dr. Munos to confine to the public reception area anyone (especially Mr. Sammons) who was not a patient or employee and to release patient information only if the particular patient authorized the release. Dr. Munos relayed Mr. Fale's instructions to other members of the MRI Center staff.

Nonetheless, the partners' anxieties persisted, and Mr. Fale continued to hear allegations that the MRI Center was improperly releasing confidential information. On April 28, 1993, Mr. Fale notified Dr. Munos and the other partners that they would have the opportunity to support or refute the allegations at a meeting scheduled for May 12. In the notice, Mr. Fale stated that the allegations had not been verified.

On May 5, 1993, Dr. Munos wrote a letter denying that he or anyone else had improperly disclosed confidential information. Dr. Munos also requested, and later received, a list of some forty MRI Center patients whose records were allegedly released without authorization in connection with the malpractice litigation. Dr. Munos testified that he and other MRI Center employees reviewed those patients' files to determine if any records had been "checked out" to plaintiffs' attorneys. Dr. Munos claimed that his investigation revealed that records of some of the listed patients had not been released and that records of others had been released but with authorization.

The May 12 partnership meeting was postponed so that the partners could continue to investigate the matter. According to Mr. Fale, none of the partners produced any evidence concerning Dr. Munos or the MRI Center, and "[n]othing happened for another couple of months." In June 1993, however, Mr. Fale learned from Cindy Godwin, an MRI Center employee, that Mr. Sammons had been seen in private areas of the MRI Center. Around June 18, Mr. Fale sought the advice of attorney Edwin Lowther, who interviewed Ms. Godwin and Terri Cooper, another MRI Center employee, and prepared affidavits for them to sign regarding their

observations of Mr. Sammons in the Center's private areas.

The evidence concerning Mr. Sammons's visits to the Center was disputed. The affidavits of Ms. Godwin and Ms. Cooper, and testimony they gave later at the trial of this matter, made it seem that Dr. Munos was involved in clandestine activities with Mr. Sammons at the MRI Center. To the contrary, Dr. Munos's testimony characterized the one, and perhaps two, instances in which Mr. Sammons had been in the break room or kitchen of the MRI Center after the issue of the propriety of his visits had arisen as "chance encounters" that were totally innocent.

The upshot of the affidavits was that an "emergency meeting" of the MRI Center partners was convened by Mr. Fale to consider the concerns of the partners with respect to their suspicions about Dr. Munos. When confronted about the allegations that Mr. Sammons had twice visited the MRI Center after the warning, Dr. Munos told the partners he knew of only one visit and explained it had to do with the matter of an unpaid electric bill of an office rented by Mr. Sammons from Dr. Munos. Dr. Munos was asked to leave the meeting and did so without protest. The affidavits were presented, and the partners voted to terminate Dr. Munos's contract without giving Dr. Munos an opportunity to present the results of his own investigation. There was no attempt to dissolve the partnership or to oust Dr. Munos as a partner or to affect in any way his interest in the partnership.

> In reviewing the denial of a motion for a directed verdict, we must view the evidence in the light most favorable to the party against whom the verdict is sought and give its highest probative value, taking into account all reasonable inferences deducible from it. If there is any substantial evidence to support the verdict, we must affirm the trial court.

*Arkansas Kraft v. Cottrell*, 313 Ark. 465, 470, 855 S.W.2d 333 (1993) (citations omitted). Applying this standard, we agree that the Trial Court erred in denying the motions for directed verdict.

### 1. Tortious interference with a contract

Dr. Munos alleged that Mr. Fale, acting in the course and scope of his employment with Sisters, influenced the partners to terminate wrongfully the contract between Dr. Munos and the partnership. Dr. Munos claimed the following actions taken by Mr. Fale constituted improper "interference" with the contract: (1) asking Mr. Lowther to draft the affidavits of Ms. Godwin and Ms.

Cooper; (2) concealing the existence of the affidavits from Dr. Munos; (3) calling the partnership meeting on June 22 and revealing the affidavits to the other partners; and (4) requesting Dr. Munos to leave the portion of the meeting in which the partners reviewed the affidavits and voted to terminate the contract. As we said above, the jury found Mr. Fale directly liable, and Sisters vicariously liable, for interfering with the contract between Dr. Munos and the partnership.

■ While we have serious doubt as to whether the actions taken by Mr. Fale rise to the level of "tortious interference" in any event, we must reverse the jury's verdict because the evidence adduced at trial fails to show that Mr. Fale was acting in the scope of his agency relationship with Sisters. In our view, the evidence shows only that Mr. Fale took the actions described above in the scope of his employment with St. Joseph's; therefore, the issue of Sisters' liability for interference with the contract should not have gone to the jury.

■ Under the doctrine of *respondeat superior,* an employer may be held vicariously liable for the tortious conduct of an agent if the evidence shows that such conduct was committed within the scope of the agent's employment. *National Bank of Commerce* v. *HCA Health Servs. of Midwest, Inc.,* 304 Ark. 55, 58, 800 S.W.2d 694 (1990). Although it is true that Sisters hired Mr. Fale and paid his salary, Mr. Fale's employment with Sisters was solely to serve as chief executive officer and president of St. Joseph's. Thus, while Mr. Fale was an agent of Sisters, he also was a "loaned employee," or "borrowed servant," of St. Joseph's. The critical question is whether Mr. Fale, in taking the actions described above, was acting in the scope of his agency with Sisters or his agency with St. Joseph's.

■ We have recognized the borrowed-servant doctrine in numerous cases. As we have said,

> one who is the general servant of another may be lent or hired by his master to another for some special service, so as to become as to that service the servant of such third party. The test is whether, in the particular service which he is engaged to perform, he continues liable to the direction and control of his master or becomes subject to that of the party to whom he is lent or hired.

*Arkansas Nat. Gas Co.* v. *Miller,* 105 Ark. 477, 482, 152 S.W. 147 (1912) (citation omitted). *See Barton-Mansfield Co.* v. *Bogey,* 201

Ark. 860, 147 S.W.2d 977 (1941). *See also Cash* v. *Carter,* 312 Ark. 41, 46, 847 S.W.2d 18 (1993)("The most significant question regarding a loaned employee is which company has direction and control of the employee."); *George's, Inc.* v. *Otwell,* 282 Ark. 152, 154, 666 S.W.2d 406 (1984)("In a series of cases we have held that the most significant question regarding a loaned employee is which company has direction and control of the employee.").

The Restatement provides additional guidance on this point:

> Since the question of liability is always raised because of some specific act done, the important question is not whether or not he remains the servant of the general employer as to matters generally, but whether or not, as to the act in question, he is acting in the business of and under the direction of one or the other. It is not conclusive that in practice he would be likely to obey the directions of the general employer in case of conflict of orders. The question is whether it is understood between him and his employers that he is to remain in the allegiance of the first as to a specific act, or is to be employed in the business of and subject to the direction of the temporary employer as to the details of such act. This is a question of fact in each case.

RESTATEMENT (SECOND) OF AGENCY § 227 cmt. a (1958).

 We agree that, "[o]rdinarily the question whether the general or special employer had the right of control and thus was the employee's master, presents an issue of fact for the jury." *Watland* v. *Walton,* 410 F.2d 1, 3-4 (8th Cir. 1969). However, "where all of the evidence is in one direction and there is no rational basis for reasonable minds to differ as to the status of the servant the issue is one of law for the court to resolve." *Id.*

Mr. Fale testified he reported occasionally to his superior with Sisters in St. Louis. He also testified, however, that he responded to the St. Joseph's Board of Directors. In this case, the evidence is "in one direction" that St. Joseph's directed and controlled Mr. Fale in the narrow arena of partnership affairs. It is clear that Mr. Fale did not participate in matters affecting the partnership by virtue of his employment with Sisters. Rather, Mr. Fale was chosen by St. Joseph's to represent its interest in the partnership, and he was able to take the actions leading to Dr. Munos's termination because St. Joseph's had placed him in a position to do so. All the evidence points to St. Joseph's retaining control over Mr. Fale in this instance,

and there simply is no evidence in the record that Sisters directed or controlled Mr. Fale with respect to partnership matters, including those related to the contract with Dr. Munos.

■ Thus, viewing the evidence in the light most favorable to Dr. Munos, we hold there was no substantial evidence supporting the jury's finding that Mr. Fale acted, with respect to the contract between Dr. Munos and the partnership, on behalf of Sisters. We therefore reverse and dismiss the verdict against Sisters.

■ We also reverse and dismiss the verdict against Mr. Fale. We do so because he took the actions described above on behalf of St. Joseph's, a party to the contract in question. It is well settled that a party to a contract, and its agents acting in the scope of their authority, cannot be held liable for interfering with the party's own contract. *See Fisher v. Jones*, 311 Ark. 450, 457, 844 S.W.2d 954 (1993); *Harrell v. Reynolds Metals Co.*, 495 So.2d 1381, 1387-1388 (Ala. 1986). *See also Abruzzo v. Haller*, 603 So.2d 1338, 1340 (Fla. App. 1 Dist. 1992), in which it was said that "An agent of a corporate party to a contract, acting within his capacity and scope as an agent, cannot be considered to be a separate entity outside of the contractual relationship which can tortiously interfere with that relationship." In *Hicks v. Haight*, 171 Misc. 151, 11 N.Y.S.2d 912, 917 (N.Y. Sup. Ct. 1939), the Court said, "It would be anomalous indeed to hold an agent liable for tort committed within the scope of his authority, when liability does not attach to the principal for the same tort committed on his behalf and presumably for his benefit."

■ The contract in this case was between the partners and Dr. Munos. Mr. Fale, acting on behalf of St. Joseph's, stood in the shoes of one of the partners and therefore was incapable of interfering in the contract. Mr. Fale was thus entitled to a directed verdict.

### 2. Breach of fiduciary duty

Dr. Munos alleged that St. Joseph's, as a partner, and Mr. Fale, as an officer of St. Joseph's, owed and breached a fiduciary duty of loyalty and utmost good faith and fair dealing. Dr. Munos claimed the following actions taken by St. Joseph's and Mr. Fale constituted a breach of this asserted duty: (1) terminating the contract; (2) scheming to terminate the contract in order to blame Dr. Munos for the malpractice litigation, oust him from the partnership, and increase their share of partnership profits; and (3) refusing to review evidence that supposedly rebutted the allegations against Dr. Mu-

nos. As stated previously, the jury found Mr. Fale and St. Joseph's liable on this claim.

We agree with St. Joseph's and Mr. Fale that the evidence adduced at trial fails to show a breach of fiduciary duty. The issue of St. Joseph's and Mr. Fale's liability on this claim should not have gone to the jury.

■ Our cases have established that a partner owes a fellow partner certain fiduciary duties. "A partnership," as we said in *Boswell v. Gillet*, 226 Ark. 935, 944, 295 S.W.2d 758 (1956), "is a relationship of trust and confidence and partners must observe the utmost good faith toward each other in all of their transactions from the time they begin negotiations with each other to the complete settlement of the partnership affairs."

■ Not only does our common law recognize a fiduciary duty between partners, but the General Assembly, in adopting the Uniform Partnership Act, has imposed on partners the following fiduciary obligation:

> Every partner must account to the partnership for any bene-fit and hold as trustee for it any profits derived by him without the consent of the other partners from any transaction connected with the formation, conduct, or liquidation of the partnership or from any use by him of its property.

Ark. Code Ann. § 4-42-404(1) (Repl. 1996). A breach of this obligation entitles the injured partner to an accounting. Ark. Code Ann. § 4-42-405 (Repl. 1996).

We do not question the existence of a fiduciary duty between partners, and we agree that St. Joseph's owed such a duty to Dr. Munos. However, we believe that Dr. Munos has failed to show that St. Joseph's or Mr. Fale has breached any fiduciary obligation.

The proof showed only that Dr. Munos, a partner in the MRI Center, acquired by contract the additional status of an independent contractor who was responsible for managing the Center and providing certain services. The terms of the contract conferring this status on Dr. Munos provided that St. Joseph's, with the consent of only two other partners, could terminate the contract. St. Joseph's and the other partners exercised this option provided by the contract and dismissed Dr. Munos from his management position upon credible evidence that he had failed to maintain a confidential atmosphere at the MRI Center. Moreover, we are mindful that

some or all of the partners might not have considered Dr. Munos's rebuttal evidence in reaching their decision, but we point out that the contract did not require the partners to take such evidence into account before voting to terminate the contract.

Finally, there was absolutely no proof that St. Joseph's or Mr. Fale acted out of a desire to expel Dr. Munos from the partnership or otherwise affect his status as a partner, his partnership interest, or his monthly partnership income. As the testimony established, Dr. Munos remains a partner in the MRI Center and continues to receive a monthly income based on his 19.8 percent share. Nothing in the evidence presented by either side showed a breach of the fiduciary relationship.

We have found no case in which a partner who was also an independent contractor employed by the partnership has claimed a breach of the fiduciary relationship among partners arising out of his or her treatment with respect to the employment contract. We have, however, found support for our conclusion in analogous cases from other jurisdictions.

We have placed particular reliance on a line of cases considering whether partners violate their fiduciary duty when they expel another partner from the partnership in accordance with a partnership agreement. As noted by the Texas Court of Appeals, several jurisdictions have concluded "that expulsion of a partner from a partnership cannot be in bad faith even where the partnership agreement allows for expulsion without cause and even, at times, without notice." *Bohatch* v. *Butler & Binion*, 905 S.W.2d 597, 602 (Tex. App.—Houston [14 Dist.]1995). Such a rule is appropriate, courts have found, because "at the heart of the partnership concept is the principle that partners may choose with whom they wish to be associated." *Gelder Medical Group* v. *Webber*, 363 N.E.2d 573, 577 (N.Y. 1977).

As a result, if the partners have "the right to expel [a fellow partner] without stating reason or cause pursuant to the partnership agreement, there [is] no breach of any fiduciary duty" on the part of the partners when they exercise that right. *Holman* v. *Coie*, 522 P.2d 515, 524 (Wash. App. 1974). *See Leigh* v. *Crescent Square, Ltd.*, 608 N.E.2d 1166, 1170 (Ohio Ct. App. 1992).

The analogy to those cases is useful here. If a partner, pursuant to an agreement, may expel another partner from the partnership without breaching a fiduciary duty, then he may also

dismiss a partner, pursuant to an agreement, from an independent contractor position without breaching a fiduciary duty. *See Day* v. *Sidley & Austin*, 394 F. Supp. 986, 992 (D.C. 1975), in which it was said that, "Generally, common law and statutory standards concerning relationships between partners can be overridden by an agreement reached by the parties themselves."

Finally, we find an apt analogy in the suggestion made by the New York Court of Appeals that it is necessary "to appreciate and keep distinct the duty a corporation owes to a minority shareholder *as a shareholder* from any duty it might owe him as an employee." *Ingle* v. *Glamore Motor Sales, Inc.*, 535 N.E.2d 1311, 1313 (N.Y. 1989). In that case, a shareholder in a closed corporation was terminated as an at-will employee and claimed that his fellow shareholders breached their fiduciary duty by firing him. The Court of Appeals rejected the claim. The Court noted that the employment agreement allowed for his termination for any reason, and it refused to find that the shareholder was "entitled by reason of his minority shareholder status to a fiduciary-rooted protection against being fired." *Id.* at 1313.

St. Joseph's owed Dr. Munos no fiduciary duty in its contractual relationship with him, and there was no evidence that the fiduciary duty owed to him as a partner was violated. Therefore, the directed-verdict motion should have been granted.

Reversed and dismissed on appeal; cross-appeal moot.

BROWN, J., not participating.