**Colette BOHATCH, Petitioner,**

v.

**BUTLER & BINION, et al., Respondents.**

**No. 95–0934.**

Supreme Court of Texas.

Argued Nov. 20, 1996.

Decided Jan. 22, 1998.

H. Victor Thomas, Eliot P. Tucker, Houston, for petitioner.

Richard N. Countiss, David W. Holman, Larry D. Knippa, Houston, for respondents.

ENOCH, Justice, delivered the opinion of the Court, in which GONZALEZ, OWEN, BAKER, and HANKINSON, Justices, join.

Partnerships exist by the agreement of the partners; partners have no duty to remain partners. The issue in this case is whether we should create an exception to this rule by holding that a partnership has a duty not to expel a partner for reporting suspected overbilling by another partner. The trial court rendered judgment for Colette Bohatch on her breach of fiduciary duty claim against Butler & Binion and several of its partners (collectively, "the firm"). The court of appeals held that there was no evidence that the firm breached a fiduciary duty and reversed the trial court's tort judgment; however, the court of appeals found evidence of a breach of the partnership agreement and rendered judgment for Bohatch on this ground. 905 S.W.2d 597. We affirm the court of appeals' judgment.

## I. FACTS

Bohatch became an associate in the Washington, D.C., office of Butler & Binion in 1986 after working for several years as Deputy Assistant General Counsel at the Federal Energy Regulatory Commission. John McDonald, the managing partner of the office, and Richard Powers, a partner, were the only other attorneys in the Washington office. The office did work for Pennzoil almost exclusively.

Bohatch was made partner in February 1990. She then began receiving internal firm reports showing the number of hours each attorney worked, billed, and collected. From her review of these reports, Bohatch became concerned that McDonald was overbilling Pennzoil and discussed the matter with Powers. Together they reviewed and copied portions of McDonald's time diary. Bohatch's review of McDonald's time entries increased her concern.

On July 15, 1990, Bohatch met with Louis Paine, the firm's managing partner, to report her concern that McDonald was overbilling Pennzoil. Paine said he would investigate. Later that day, Bohatch told Powers about her conversation with Paine.

The following day, McDonald met with Bohatch and informed her that Pennzoil was not satisfied with her work and wanted her work to be supervised. Bohatch testified that this was the first time she had ever heard criticism of her work for Pennzoil.

The next day, Bohatch repeated her concerns to Paine and to R. Hayden Burns and Marion E. McDaniel, two other members of the firm's management committee, in a telephone conversation. Over the next month, Paine and Burns investigated Bohatch's complaint. They reviewed the Pennzoil bills and supporting computer print-outs for those bills. They then discussed the allegations with Pennzoil in-house counsel John Chapman, the firm's primary contact with Pennzoil. Chapman, who had a long-standing relationship with McDonald, responded that Pennzoil was satisfied that the bills were reasonable.

In August, Paine met with Bohatch and told her that the firm's investigation revealed no basis for her contentions. He added that she should begin looking for other employment, but that the firm would continue to provide her a monthly draw, insurance coverage, office space, and a secretary. After this meeting, Bohatch received no further work assignments from the firm.

In January 1991, the firm denied Bohatch a year-end partnership distribution for 1990 and reduced her tentative distribution share for 1991 to zero. In June, the firm paid

Bohatch her monthly draw and told her that this draw would be her last. Finally, in August, the firm gave Bohatch until November to vacate her office.

By September, Bohatch had found new employment. She filed this suit on October 18, 1991, and the firm voted formally to expel her from the partnership three days later, October 21, 1991.

The trial court granted partial summary judgment for the firm on Bohatch's wrongful discharge claim, and also on her breach of fiduciary duty and breach of the duty of good faith and fair dealing claims for any conduct occurring after October 21, 1991 (the date Bohatch was formally expelled from the firm). The trial court denied the firm's summary judgment motion on Bohatch's breach of fiduciary duty and breach of the duty of good faith and fair dealing claims for conduct occurring before October 21, 1991. The breach of fiduciary duty claim and a breach of contract claim were tried to a jury. The jury found that the firm breached the partnership agreement and its fiduciary duty. It awarded Bohatch $57,000 for past lost wages, $250,000 for past mental anguish, $4,000,000 total in punitive damages (this amount was apportioned against several defendants), and attorney's fees. The trial court rendered judgment for Bohatch in the amounts found by the jury, except it disallowed attorney's fees because the judgment was based in tort. After suggesting remittitur, which Bohatch accepted, the trial court reduced the punitive damages to around $237,000.

All parties appealed. The court of appeals held that the firm's only duty to Bohatch was not to expel her in bad faith. 905 S.W.2d at 602. The court of appeals stated that " '[b]ad faith' in this context means only that partners cannot expel another partner for self-gain." *Id.* Finding no evidence that the firm expelled Bohatch for self-gain, the court concluded that Bohatch could not recover for breach of fiduciary duty. *Id.* at 604. However, the court concluded that the firm breached the partnership agreement when it reduced Bohatch's tentative partnership distribution for 1991 to zero without notice, and when it terminated her draw three months before she left. *Id.* at 606. The court con-

cluded that Bohatch was entitled to recover $35,000 in lost earnings for 1991 but none for 1990, and no mental anguish damages. *Id.* at 606–07. Accordingly, the court rendered judgment for Bohatch for $35,000 plus $225,000 in attorney's fees. *Id.* at 608.

## II. BREACH OF FIDUCIARY DUTY

We have long recognized as a matter of common law that "[t]he relationship between ... partners ... is fiduciary in character, and imposes upon all the participants the obligation of loyalty to the joint concern and of the utmost good faith, fairness, and honesty in their dealings with each other with respect to matters pertaining to the enterprise." *Fitz–Gerald v. Hull,* 150 Tex. 39, 237 S.W.2d 256, 264 (1951) (quotation omitted). Yet, partners have no obligation to remain partners; "at the heart of the partnership concept is the principle that partners may choose with whom they wish to be associated." *Gelder Med. Group v. Webber,* 41 N.Y.2d 680, 394 N.Y.S.2d 867, 870–71, 363 N.E.2d 573, 577 (1977). The issue presented, one of first impression, is whether the fiduciary relationship between and among partners creates an exception to the at-will nature of partnerships; that is, in this case, whether it gives rise to a duty not to expel a partner who reports suspected overbilling by another partner.

At the outset, we note that no party questions that the obligations of lawyers licensed to practice in the District of Columbia—including McDonald and Bohatch—were prescribed by the District of Columbia Code of Professional Responsibility in effect in 1990, and that in all other respects Texas law applies. Further, neither statutory nor contract law principles answer the question of whether the firm owed Bohatch a duty not to expel her. The Texas Uniform Partnership Act, TEX.REV.CIV. STAT. ANN. art. 6701b, addresses expulsion of a partner only in the context of dissolution of the partnership. *See id.* §§ 31, 38. In this case, as provided by the partnership agreement, Bohatch's expulsion did not dissolve the partnership. Additionally, the new Texas Revised Partnership Act, TEX.REV.CIV. STAT. ANN. art. 6701b–1.01 to –11.04, does not have retroactive ef-

fect and thus does not apply. *See id.* art. 6701b–11.03. Finally, the partnership agreement contemplates expulsion of a partner and prescribes procedures to be followed, but it does not specify or limit the grounds for expulsion. Thus, while Bohatch's claim that she was expelled in an *improper way* is governed by the partnership agreement, her claim that she was expelled for an *improper reason* is not. Therefore, we look to the common law to find the principles governing Bohatch's claim that the firm breached a duty when it expelled her.

Courts in other states have held that a partnership may expel a partner for purely business reasons. *See St. Joseph's Reg'l Health Ctr. v. Munos,* 326 Ark. 605, 934 S.W.2d 192, 197 (1996) (holding that partner's termination of another partner's contract to manage services performed by medical partnership was not breach of fiduciary duty because termination was for business purpose); *Waite v. Sylvester,* 131 N.H. 663, 560 A.2d 619, 622–23 (1989) (holding that removal of partner as managing partner of limited partnership was not breach of fiduciary duty because it was based on legitimate business purpose); *Leigh v. Crescent Square, Ltd.,* 80 Ohio App.3d 231, 608 N.E.2d 1166, 1170 (1992) ("Taking into account the general partners' past problems and the previous litigation wherein Leigh was found to have acted in contravention of the partnership's best interests, the ouster was instituted in good faith and for legitimate business purposes."). Further, courts recognize that a law firm can expel a partner to protect relationships both within the firm and with clients. *See Lawlis v. Kightlinger & Gray,* 562 N.E.2d 435, 442 (Ind.App.1990) (holding that law firm did not breach fiduciary duty by expelling partner after partner's successful struggle against alcoholism because "if a partner's propensity toward alcohol has the potential to damage his firm's good will or reputation for astuteness in the practice of law, simple prudence dictates the exercise of corrective action ... since the survival of the partnership itself potentially is at stake"); *Holman v. Coie,* 11 Wash.App. 195, 522 P.2d 515, 523 (1974) (finding no breach of fiduciary duty where law firm expelled two partners because of their contentious behavior during executive committee meetings and because one, as state senator, made speech offensive to major client). Finally, many courts have held that a partnership can expel a partner without breaching any duty in order to resolve a "fundamental schism." *See Waite,* 560 A.2d at 623 (concluding that in removing partner as managing partner "the partners acted in good faith to resolve the 'fundamental schism' between them"); *Heller v. Pillsbury Madison & Sutro,* 50 Cal.App.4th 1367, 58 Cal.Rptr.2d 336, 348 (1996) (holding that law firm did not breach fiduciary duty when it expelled partner who was not as productive as firm expected and who was offensive to some of firm's major clients); *Levy v. Nassau Queens Med. Group,* 102 A.D.2d 845, 476 N.Y.S.2d 613, 614 (1984) (concluding that expelling partner because of "[p]olicy disagreements" is not "bad faith").

█ The fiduciary duty that partners owe one another does not encompass a duty to remain partners or else answer in tort damages. Nonetheless, Bohatch and several distinguished legal scholars urge this Court to recognize that public policy requires a limited duty to remain partners—*i.e.,* a partnership must retain a whistleblower partner. They argue that such an extension of a partner's fiduciary duty is necessary because permitting a law firm to retaliate against a partner who in good faith reports suspected overbilling would discourage compliance with rules of professional conduct and thereby hurt clients.

█ While this argument is not without some force, we must reject it. A partnership exists solely because the partners choose to place personal confidence and trust in one another. *See Holman,* 522 P.2d at 524 ("The foundation of a professional relationship is personal confidence and trust."). Just as a partner can be expelled, without a breach of any common law duty, over disagreements about firm policy or to resolve some other "fundamental schism," a partner can be expelled for accusing another partner of overbilling without subjecting the partnership to tort damages. Such charges, whether true or not, may have a profound effect on the personal confidence and trust essential to the

partner relationship. Once such charges are made, partners may find it impossible to continue to work together to their mutual benefit and the benefit of their clients.

We are sensitive to the concern expressed by the dissenting Justices that "retaliation against a partner who tries in good faith to correct or report perceived misconduct virtually assures that others will not take these appropriate steps in the future." 977 S.W.2d at 561 (Spector, J., dissenting). However, the dissenting Justices do not explain how the trust relationship necessary both for the firm's existence and for representing clients can survive such serious accusations by one partner against another. The threat of tort liability for expulsion would tend to force partners to remain in untenable circumstance—suspicious of and angry with each other—to their own detriment and that of their clients whose matters are neglected by lawyers distracted with intra-firm frictions.

Although concurring in the Court's judgment, Justice Hecht criticizes the Court for failing to "address amici's concerns that failing to impose liability will discourage attorneys from reporting unethical conduct." 977 S.W.2d at 556 (Hecht, J., concurring). To address the scholars' concerns, he proposes that a whistleblower be protected from expulsion, but only if the report, irrespective of being made in good faith, is proved to be correct. We fail to see how such an approach encourages compliance with ethical rules more than the approach we adopt today. Furthermore, the amici's position is that a reporting attorney must be in good faith, not that the attorney must be right. In short, Justice Hecht's approach ignores the question Bohatch presents, the amici write about, and the firm challenges—whether a partnership violates a fiduciary duty when it expels a partner who in good faith reports suspected ethical violations. The concerns of the amici are best addressed by a rule that clearly demarcates an attorney's ethical duties and the parameters of tort liability, rather than redefining "whistleblower."

We emphasize that our refusal to create an exception to the at-will nature of partnerships in no way obviates the ethical duties of lawyers. Such duties sometimes necessitate difficult decisions, as when a lawyer suspects overbilling by a colleague. The fact that the ethical duty to report may create an irreparable schism between partners neither excuses failure to report nor transforms expulsion as a means of resolving that schism into a tort.

We hold that the firm did not owe Bohatch a duty not to expel her for reporting suspected overbilling by another partner.

### III. BREACH OF THE PARTNERSHIP AGREEMENT

■ The court of appeals concluded that the firm breached the partnership agreement by reducing Bohatch's tentative distribution for 1991 to zero without the requisite notice. 905 S.W.2d at 606. The firm contests this finding on the ground that the management committee had the right to set tentative and year-end bonuses. However, the partnership agreement guarantees a monthly draw of $7,500 per month regardless of the tentative distribution. Moreover, the firm's right to reduce the bonus was contingent upon providing proper notice to Bohatch. The firm does not dispute that it did not give Bohatch notice that the firm was reducing her tentative distribution. Accordingly, the court of appeals did not err in finding the firm liable for breach of the partnership agreement. Moreover, because Bohatch's damages sound in contract, and because she sought attorney's fees at trial under section 38.001(8) of the Texas Civil Practice and Remedies Code, we affirm the court of appeals' award of Bohatch's attorney's fees.

\* \* \* \* \*

We affirm the court of appeals' judgment.

HECHT, Justice, filed a concurring opinion.

SPECTOR, Justice, filed a dissenting opinion, in which PHILLIPS, Chief Justice, joined.

HECHT, Justice, concurring in the judgment.

The Court holds that partners in a law firm have no common-law liability for expel-

ling one of their number for accusing another of unethical conduct. The dissent argues that partners in a law firm are liable for such conduct. Both views are unqualified; neither concedes or even considers whether "always" and "never" are separated by any distance. I think they must be. The Court's position is directly contrary to that of some of the leading scholars on the subject who have appeared here as amici curiae. The Court finds amici's arguments "not without some force", but rejects them completely. *Ante* at 546. I do not believe amici's arguments can be rejected out of hand. The dissent, on the other hand, refuses even to acknowledge the serious impracticalities involved in maintaining the trust necessary between partners when one has accused another of unethical conduct. In the dissent's view, partners who would expel another for such accusations must simply either get over it or respond in damages. The dissent's view blinks reality.

The issue is not well developed; in fact, to our knowledge we are the first court to address it. It seems to me there must be some circumstances when expulsion for reporting an ethical violation is culpable and other circumstances when it is not. I have trouble justifying a 500-partner firm's expulsion of a partner for reporting overbilling of a client that saves the firm not only from ethical complaints but from liability to the client. But I cannot see how a five-partner firm can legitimately survive one partner's accusations that another is unethical. Between two such extreme examples I see a lot of ground.

This case does not force a choice between diametrically opposite views. Here, the report of unethical conduct, though made in good faith, was incorrect. That fact is significant to me because I think a law firm can always expel a partner for bad judgment, whether it relates to the representation of clients or the relationships with other partners, and whether it is in good faith. I would hold that Butler & Binion did not breach its fiduciary duty by expelling Colette Bohatch because she made a good-faith but nevertheless extremely serious charge against a senior partner that threatened the firm's relationship with an important client, her charge

proved groundless, and her relationship with her partners was destroyed in the process. I cannot, however, extrapolate from this case, as the Court does, that no law firm can ever be liable for expelling a partner for reporting unethical conduct. Accordingly, I concur only in the Court's judgment.

## I

I would ordinarily leave the recitation of relevant facts to the Court's opinion and not reiterate them in a separate opinion. But the fine points in this case are important to me, and rather than point out my differences with the Court, it is more convenient simply to say what I think the facts are. The evidence must, of course, be reviewed in light of the verdict and judgment favorable to Bohatch, although the reader should keep in mind that in many instances, the facts are disputed.

John McDonald, an attorney licensed to practice in the District of Columbia and managing partner of the Washington, D.C. office of Butler & Binion, a Houston-based law firm, hired Colette Bohatch, also a D.C. lawyer, as a senior associate in January 1986. The firm's Washington office had only one other lawyer—Richard Powers, also a partner in the firm—and represented essentially one client—Pennzoil—before the Federal Energy Regulatory Commission. Bohatch, who had been deputy assistant general counsel of the FERC when she left to join Butler & Binion, worked for McDonald and Powers on Pennzoil matters.

In January 1989, Bohatch was made a partner in the firm on McDonald's recommendation, and as a partner she began receiving internal firm reports showing the number of hours each attorney worked, billed, and collected for. Reviewing these reports, Bohatch questioned how McDonald could bill as many hours as he reported, given her personal observations of his work habits. She and Powers discussed the subject on several occasions and even went so far as to look through McDonald's daily time diary surreptitiously and make a copy of it.

Bohatch never saw the bills to Pennzoil, which McDonald prepared and sent, so she did not know what fees Pennzoil was actually

charged, or even what Butler & Binion's fee arrangement was with Pennzoil. Nevertheless, from monthly internal reports consistently showing that McDonald billed far more hours than she saw him working, Bohatch concluded that McDonald was overbilling Pennzoil. Convinced that she was obliged by the District of Columbia Code of Professional Responsibility governing lawyer conduct to report her concerns to the firm's management, she discussed them with Butler & Binion's managing partner, Louis Paine, on July 15, 1990. Paine assured her that he would look into the matter.

Bohatch told Powers of her meeting with Paine, and Powers told McDonald. The next day, McDonald informed Bohatch that Pennzoil was dissatisfied with her work. Bohatch feared that McDonald was retaliating against her, and in fact, from that point forward neither McDonald nor Powers assigned Bohatch any other work for Pennzoil. McDonald also insinuated to other partners that Bohatch had complained of him because Pennzoil found her work unacceptable, even though Bohatch had contacted Paine before she was aware of any criticism of her work.

Bohatch called Paine to tell him of McDonald's retaliation, and Paine assured her that he was still investigating. Paine reviewed the firm's bills to Pennzoil and found that in all but one instance fewer hours were billed than were shown on internal computer printouts as having been worked. However, since the printouts merely reflected the time reported by attorneys, and Bohatch was claiming that McDonald reported more time than he actually worked, Paine determined that Pennzoil must be told of Bohatch's assertions so that it could itself evaluate the amounts charged.

Robert Burns, a member of Butler & Binion's management committee, told John Chapman, the Pennzoil in-house attorney who dealt most directly with Butler & Binion's Washington office, of Bohatch's assertions and asked him to review the firm's bills. Chapman confirmed to Burns that he had complained to McDonald several months earlier about the quality of Bohatch's work, and Burns intimated that Bohatch's assertions might have been in response to such complaints. Chapman discussed the matter with his immediate superior and with Pennzoil's general counsel. The three of them reviewed Butler & Binion's bills for the preceding year and concluded that they were reasonable. After Chapman's superior discussed their conclusions with Pennzoil's president and chief executive officer, Chapman told Burns that Pennzoil was satisfied that the firm's bills were reasonable.

Bohatch expected that Paine would ask her for additional information, and when he did not do so, she wrote him that she believed McDonald had overcharged Pennzoil $20,000 to $25,000 per month for his work. In fact, in the preceding six months McDonald had billed Pennzoil on average less than $24,000 per month for his work, so that if Bohatch had been correct, McDonald should have billed Pennzoil almost nothing. On August 23, 1990, a few weeks after their initial meeting, Paine told Bohatch that he had found no evidence of overbilling. Since he did not see how Bohatch could continue to work for McDonald or Pennzoil under the circumstances, given the rifts her allegations had caused, Paine suggested that she begin to look for other employment.

For more than nine months Butler & Binion continued to pay Bohatch a partner's monthly draw of $7,500 and allowed her to keep her office and benefits while she sought other employment. So as not to impair her prospects, the firm did not immediately expel her as a partner, but it did not pay her any partnership distribution other than her draw. Bohatch contends that when the firm reduced her tentative distribution for 1991 to zero in January of that year, it effectively expelled her from the firm, although she continued to accept a partner's monthly draw. In April 1991, Paine told Bohatch that her draw would be discontinued in June, and in August he told her that she must vacate her office by November. Bohatch left to join another firm in September, and Butler & Binion formally expelled her as a partner in October.

Bohatch sued Butler & Binion, Paine, Burns, and McDonald for breach of the firm partnership agreement and breach of fiduciary duty. A jury found both a breach of

contract and a breach of fiduciary duty, found Bohatch's actual damages to be $57,-000 in lost earnings and $250,000 in past mental anguish, assessed $4,000,000 punitive damages against the three individual defendants, and found Bohatch's reasonable attorney fees to be $225,000. Bohatch accepted the district court's suggestion that punitive damages be remitted to $237,141, and judgment was rendered awarding Bohatch actual and punitive damages.

All parties appealed. The court of appeals held that defendants' only duty to Bohatch was not to expel her in bad faith. 905 S.W.2d 597, 602. " 'Bad faith' in this context," the court of appeals wrote, "means only that partners cannot expel another partner for self-gain." *Id.* Finding no evidence that defendants expelled Bohatch for self-gain, the court concluded that Bohatch could not recover for breach of fiduciary duty. *Id.* at 604. However, the court found that Bohatch's tentative partnership distribution for 1991 had been reduced to zero without notice to her, and that her draw had been terminated three months before she left. *Id.* at 605–06. For these breaches of the partnership agreement the court concluded that Bohatch was entitled to recover $35,000 lost earnings for 1991 but none for 1990, and no mental anguish damages. *Id.* at 606–07. Accordingly, the court rendered judgment for Bohatch for $35,000 plus $246,000 attorney fees.

Bohatch applied to this Court for writ of error, and defendants, to whom I shall refer collectively hereafter as "Butler & Binion", filed a conditional application. We denied Bohatch's application and dismissed Butler & Binion's, 39 TEX. SUP.CT. J. 725 (June 14, 1996), but on Bohatch's motion for rehearing, we granted both, 40 TEX. SUP.CT. J. 14 (Oct. 18, 1996).

## II

### A

Butler & Binion argues that its expulsion of Bohatch did not breach its fiduciary duty. No one questions that the obligations of the

lawyers licensed to practice in the District of Columbia—including McDonald and Bohatch—were prescribed by the District of Columbia Code of Professional Responsibility in effect in 1990, and that in all other respects Texas law applies.

Of the three possible sources of governing Texas law—statute, contract, and common law—only one applies here. Butler & Binion argues that it did not violate the Texas Uniform Partnership Act in effect throughout the events of this case (but since repealed), Law of May 9, 1961, 57th Leg., R.S., ch. 158, 1961 Tex. Gen. Laws 289, formerly TEX.REV. CIV. STAT. ANN. art. 6132b (Vernon 1970).[1] But Bohatch responds that TUPA does not determine her claims because it spoke to expulsion of a partner only in the context of a partnership's dissolution. *See id.* art. 6132b, §§ 31 & 38. In this case, as provided by the partnership agreement, Bohatch's expulsion did not dissolve the partnership, and thus the statute does not directly answer Bohatch's claims. The partnership agreement contemplates expulsion of a partner and prescribes procedures to be followed, but it does not specify or limit the grounds for expulsion. Bohatch's claim that she was expelled in an improper way is governed by the partnership agreement, but her claim that she was expelled for an improper reason is not. Thus, the principles governing Bohatch's claim that her expulsion was a breach of fiduciary duty must be found in the common law.

We have long recognized that " '[t]he relationship between joint adventurers, like that existing between partners, is fiduciary in character, and imposes upon all the participants the obligation of loyalty to the joint concern and of the utmost good faith, fairness, and honesty in their dealings with each other with respect to matters pertaining to the enterprise.' " *Fitz–Gerald v. Hull,* 150 Tex. 39, 237 S.W.2d 256, 264 (Tex.1951)(quoting 30 AM.JUR. *Joint Adventures* § 34 (___)). But we have never had occasion to apply this duty in the situation of a partner's expulsion. A few other appellate courts have done so. *Gelder Medical Group v. Webber,*

---

1. The current law, the Texas Revised Partnership Act, TEX.REV.CIV. STAT. ANN art. 6132b–1.01 to—10.04 (Vernon Supp.1998), did not become effec-

tive until 1994, long after the events of this case, and thus does not apply.

41 N.Y.2d 680, 394 N.Y.S.2d 867, 363 N.E.2d 573 (1977); *Heller v. Pillsbury Madison & Sutro,* 50 Cal.App.4th 1367, 58 Cal.Rptr.2d 336 (1996); *Winston & Strawn v. Nosal,* 279 Ill.App.3d 231, 215 Ill.Dec. 842, 664 N.E.2d 239 (1996); *Lawlis v. Kightlinger & Gray,* 562 N.E.2d 435 (Ind.Ct.App.1990); *Levy v. Nassau Queens Medical Group,* 102 A.D.2d 845, 476 N.Y.S.2d 613 (1984); *Leigh v. Crescent Square, Ltd.,* 80 Ohio App.3d 231, 608 N.E.2d 1166 (1992); *Holman v. Coie,* 11 Wash.App. 195, 522 P.2d 515, *review denied,* 84 Wash.2d 1011 (1974), *cert. denied,* 420 U.S. 984, 95 S.Ct. 1415, 43 L.Ed.2d 666 (1975). None has held that a partnership breached its fiduciary duty to a partner by expelling the partner. *Gelder,* 394 N.Y.S.2d at 869–871, 363 N.E.2d at 576–577; *Heller,* 58 Cal.Rptr.2d at 348; *Lawlis,* 562 N.E.2d at 439–443; *Levy,* 476 N.Y.S.2d at 614; *Leigh,* 608 N.E.2d at 1169–1171; *Holman,* 522 P.2d at 523–524. Only one has held that an expelled partner stated a claim for breach of fiduciary duty. *Nosal,* 215 Ill.Dec. at 847–849, 664 N.E.2d at 244–246.

The courts have not had much difficulty holding that a partnership may expel a partner for purely business reasons. In *Leigh,* for example, a limited partnership formed to rehabilitate an apartment complex expelled a general partner, one Leigh, for misconduct in connection with the partnership's affairs. The court held that the partnership's failure to give Leigh notice of his impending ouster was not a breach of fiduciary duty. The court explained:

> We find that a general partner's fiduciary duty applies only to activities where a partner will take advantage of his position in the partnership for his own profit or gain. Taking into account the general partners' past problems and the previous litigation wherein Leigh was found to have acted in contravention of the partnership's best interests, the ouster was instituted in good faith and for legitimate business purposes.

608 N.E.2d at 1170. *Cf. Waite v. Sylvester,* 131 N.H. 663, 560 A.2d 619, 622–623 (1989) (holding that removal of a partner as managing partner of a limited partnership formed to own and operate a resort was not a breach

of fiduciary duty because there was a legitimate business purpose); *St. Joseph's Regional Health Center v. Munos,* 326 Ark. 605, 934 S.W.2d 192, 197 (1996) (holding that a partner's termination of another partner's contract to manage services performed by their medical partnership was not a breach of fiduciary duty because there was a business purpose).

At least in the context of professional partnerships, the courts have uniformly recognized that a partner can be expelled to protect relationships both inside the firm and with clients. In *Holman,* a law firm expelled two partners, both sons of a retired partner, because they had been contentious members of the executive committee, and because one of them, as a state senator, had made a speech offensive to a major client. The court held that while the partners remaining in the firm owed the expelled partners a fiduciary duty,

> the personal relationships between partners to which the terms 'bona fide' and 'good faith' relate are those which have a bearing upon the business aspects or property of the partnership and prohibit a partner, to-wit, a fiduciary, from taking any personal advantage touching those subjects. Plaintiffs' claims do not relate to the business aspects or property rights of this partnership. There is no evidence the purpose of the severance was to gain any business or property advantage to the remaining partners. Consequently, in that context, there has been no showing of breach of the duty of good faith toward plaintiffs.

522 P.2d at 523 (citations omitted). *Cf. Waite,* 560 A.2d at 623 (concluding that in removing a partner as managing partner "the partners acted in good faith to resolve the 'fundamental schism' between them").

Likewise, in *Heller,* the court held that a law firm was not liable for expelling Heller, a partner, who was not as productive as the firm expected and who was offensive to some of the firm's major clients. The court wrote: "Although partners owe each other and the partnership a fiduciary duty, this duty 'applies only to situations where one partner could take advantage of his position to reap

personal profit or act to the partnership's detriment.'" *Heller,* 58 Cal.Rptr.2d at 348 (quoting *Leigh,* 608 N.E.2d at 1170). The court added:

> More importantly, even with evaluating the evidence in the light most favorable to Heller, the evidence shows that the Executive Committee expelled Heller because of a loss of trust in him. "The foundation of a professional relationship is personal confidence and trust. Once a schism develops, its magnitude may be exaggerated rightfully or wrongfully to the point of destroying a harmonious accord. When such occurs, an expeditious severance is desirable...."

*Id.* (quoting *Holman,* 522 P.2d at 524).

In *Lawlis,* the court stressed the importance of a law firm's reputation in holding that the firm was not liable for expelling a partner, one Lawlis, following his successful struggle against alcoholism. The court observed that had the firm acted in bad faith or with a predatory purpose, it would have violated both the partnership agreement and its fiduciary duty, but the court limited actionable conduct to partners' attempting to obtain a personal financial advantage from the expulsion. The court explained:

> The lifeblood of any partnership contains two essential ingredients, cash flow and profit, and the prime generators of that lifeblood are "good will" and a favorable reputation. The term "good will" generally is defined as the probability that old customers of the firm will resort to the old place of business where it is well-established, well known, and enjoys the fixed and favorable consideration of its customers. An equally important business adjunct of a partnership engaged in the practice of law is a favorable reputation for ability and competence in the practice of that profession. A favorable reputation not only is involved in the retention of old clients, it is an essential ingredient in the acquisition of new ones. Any condition which has the potential to adversely affect the good will or favorable reputation of a law partnership is one which potentially involves the partnership's economic survival. Thus, if a partner's propensity toward

alcohol has the potential to damage his firm's good will or reputation for astuteness in the practice of law, simple prudence dictates the exercise of corrective action, as in *Holman,* since the survival of the partnership itself potentially is at stake.

*Lawlis,* 562 N.E.2d at 442 (citations omitted).

In *Levy,* a medical partnership claimed that it expelled a partner, Dr. Levy, because the partnership agreement allowed for expulsion of partners over seventy years of age. Dr. Levy countered that he had been expelled for being critical of partnership policies. The court held that even if Dr. Levy were right, the partnership did not breach any duty owed him.

> While bad faith may be actionable, there must be some showing that the partnership acted out of a desire to gain a business or property advantage for the remaining partners. Policy disagreements do not constitute bad faith since "at the heart of the partnership concept is the principle that partners may choose with whom they wish to be associated".

*Levy,* 476 N.Y.S.2d at 614 (citing *Holman* and *Gelder,* citations omitted).

Despite statements in these cases that partners cannot expel one of their number for personal profit, in each instance the expelling partners believed that retaining the partner would hurt the firm financially and that the firm—and thus the partners themselves—stood to benefit from the expulsion. It is therefore far too simplistic to say, as the court of appeals held, that partners cannot expel a partner for personal financial benefit; if expulsion of a partner to protect the firm's reputation or preserve its relationship with a client benefits the firm financially, it perforce benefits the members of the firm. If expulsion of a partner can be in breach of a fiduciary duty, the circumstances must be more precisely defined.

The New York Court of Appeals—the only high court to have addressed the topic—has expressed hesitation in specifying whether and when expulsion of a partner breaches fiduciary duties. In *Gelder,* a surgeon, a certain Dr. Webber, was expelled from a

medical partnership because his personal and professional conduct had become abrasive and objectionable to his partners. Dr. Webber's psychiatrist described him as "a perfectionist who was a 'rather idealistic sincere, direct, frank individual who quite possibly could be perceived at times as being somewhat blunt.' " 394 N.Y.S.2d at 868–870, 363 N.E.2d at 575–576. The court held that expulsion in accordance with the partnership agreement was proper. The court added:

> *Assuming, not without question, that bad faith might limit the otherwise absolute language of the agreement,* the record does not reveal bad faith. Embarrassing situations developed, affecting the physicians and their patients, as a result of Dr. Webber's conduct, however highly motivated his conduct might have been. It was as important, therefore, in the group's eyes, as anything affecting survival of the group that it be disassociated from the new member's conflict-producing conduct. Indeed, at the heart of the partnership concept is the principle that partners may choose with whom they wish to be associated.
>
> *Even if* bad faith on the part of the remaining partners would nullify the right to expel one of their number, it does not follow that under an agreement permitting expulsion without cause the remaining partners have the burden of establishing good faith. To so require would nullify the right to expel without cause and frustrate the obvious intention of the agreement to avoid bitter and protracted litigation over the reason for the expulsion. Obviously, no expulsion would ever occur without some cause, fancied or real, but the agreement provision is addressed to avoiding the necessity of showing cause and litigating the issue. On the other hand, if an expelled partners [sic] were to allege and prove bad faith going to the essence, a different case would be presented.... In his affidavits Dr. Webber has not shown even a suggestion of evil, malevolent, or predatory purpose in the expulsion. Hence, he raises no triable issue on this score.

*Gelder,* 394 N.Y.S.2d at 869–871, 363 N.E.2d at 576–577 (emphasis added; citations omitted). The court did not suggest what it might consider "bad faith going to the essence" or an "evil, malevolent, or predatory purpose". *See also Day v. Sidley & Austin,* 394 F.Supp. 986, 992–94 (D.D.C.1975) (holding that merger of two law firms resulting in demotion of the managing partner of one office and his consequent resignation was not a breach of fiduciary duty); *but see also Beasley v. Cadwalader, Wickersham & Taft,* No. 94–8646AJ, 1996 WL 438777 (Fla.Cir.Ct. July 23, 1996) (reporting a trial court's $2.5 million award to a partner expelled from a law firm as part of an office closing and reduction in size, because the purpose of the expulsion was to generate greater profits for the remaining partners, in violation of their fiduciary duty).

In only one case has an appellate court confronted circumstances which it believed might give rise to liability for a breach of fiduciary duty in expelling a partner. In *Nosal,* an attorney claimed that he had been expelled from his firm because of his insistence on his right under the partnership agreement to inspect firm records which he believed would show misconduct by the firm's management. The court reversed summary judgment for the firm, holding that Nosal's evidence raised a fact issue that his expulsion was in breach of the fiduciary duty owed him. *Nosal,* 215 Ill.Dec. at 849, 664 N.E.2d at 246.

Scholars are divided over not only how but whether partners' common-law fiduciary duty to each other limit expulsion of a partner. There is also disagreement over the impact of the Revised Uniform Partnership Act (which, as I have noted, has been adopted in Texas) on this issue. *See* J. William Callison, *Blind Men and Elephants: Fiduciary Duties Under the Revised Uniform Partnership Act, Uniform Limited Liability Company Act, and Beyond,* 1 J. SMALL & EMERGING BUS. L. 109 (1997); Allan W. Vestal, *"Assume a Rather Large Boat ...": The Mess We Have Made of Partnership Law,* 54 WASH. & LEE L.REV. 487 (1997); Larry E. Ribstein, *Fiduciary Duty Contracts in Unincorporated Firms,* 54 WASH. & LEE L.REV. 537 (1997); Donald J. Weidner, *Foreword to Freedom of Contract and Fiduciary Duty: Organizing the Internal Relations of the Unincorporated*

*Firm*, 54 WASH. & LEE L.REV. 389 (1997). Nine distinguished law professors—Professor Richard L. Abel of the University of California at Los Angeles School of Law, Professor Leonard Gross of the Southern Illinois University School of Law, Professor Robert W. Hamilton of the University of Texas School of Law, Professor David J. Luban of the University of Maryland School of Law, Professor Gary Minda of the Brooklyn Law School, Professor Ronald D. Rotunda of the University of Illinois College of Law, Professor Theodore J. Schneyer of the University of Arizona College of Law, Professor Clyde W. Summers of the University of Pennsylvania School of Law, and Professor Charles W. Wolfram of the Cornell Law School OF LAW, the Reporter for the *Restatement (Third) of Law, The Law Governing Lawyers*—have argued in amicus curiae briefs that expulsion of a partner in bad faith is a breach of fiduciary duty, and that expulsion for self-gain is in bad faith, but so is expulsion for reporting unethical conduct. From a canvass of the various commentators' arguments it is fair to say that the law governing liability for expulsion of a partner is relatively uncertain.

## B

No court has considered whether expulsion of a partner from a law firm for reporting unethical conduct is a breach of fiduciary duty. Several courts have concluded that expulsion to remedy a fundamental schism in a professional firm is not a breach of fiduciary duty. There is hardly a schism more fundamental than that caused by one partner's accusing another of unethical conduct. If a partner can be expelled because of disagreements over nothing more significant than firm policy and abrasive personal conduct, as cases have held, surely a partner can be expelled for accusing another partner of something as serious as unethical conduct. Once such charges are raised, I find it hard to imagine how partners could continue to work together to their mutual benefit and the benefit of their clients. The trust essential to the relationship would have been destroyed. Indeed, I should think that a lawyer who was unable to convince his or her partners to rectify the unethical conduct of another would choose to withdraw from the firm rather than continue in association with lawyers who did not adhere to high ethical standards.

But I am troubled by the arguments of the distinguished amici curiae that permitting a law firm to retaliate against a partner for reporting unethical behavior would discourage compliance with rules of conduct, hurt clients, and contravene public policy. Their arguments have force, but they do not explain how a relationship of trust necessary for both the existence of the firm and the representation of its clients can survive such serious accusations by one partner against another. The threat of liability for expulsion would tend to force partners to remain in untenable circumstances—suspicious of and angry with each other—to their own detriment and that of their clients whose matters are neglected by lawyers distracted with intra-firm frictions. If "at the heart of the partnership concept is the principle that partners may choose with whom they wish to be associated", *Gelder*, 394 N.Y.S.2d at 870–871, 363 N.E.2d at 577, surely partners are not obliged to continue to associate with someone who has accused one of them of unethical conduct.

This very difficult issue need not be finally resolved in this case. Bohatch did not report unethical conduct; she reported what she *believed*, presumably in good faith but nevertheless mistakenly, to be unethical conduct. At the time, the District of Columbia Code of Professional Responsibility provided that "[a] lawyer shall not .... collect a[ ] ... clearly excessive fee." D.C.CODE OF PROF'L. RESP. DR 2–106(A) (1990). Pennzoil's conclusion that Butler & Binion's fees were reasonable, reached after being made aware of Bohatch's concerns that McDonald's time was overstated, establishes that Butler & Binion did not collect excessive fees from Pennzoil. A fee that a client as sophisticated as Pennzoil considers reasonable is not clearly excessive simply because a lawyer believes it could have been less. Bohatch's argument that Pennzoil had other reasons not to complain of Butler & Binion's bills is simply beside the point. Whatever its motivations, Pennzoil found the bills reasonable, thereby establish-

ing that McDonald had not overbilled in violation of ethical rules. Bohatch's argument that Pennzoil's assessment of the bills was prejudiced by Butler & Binion's misrepresentations about her is implausible. There is nothing to suggest that Pennzoil would have thought clearly excessive legal fees were reasonable simply because it did not like Bohatch.

Bohatch's real concern was not that fees to Pennzoil were excessive—she had never even seen the bills and had no idea what the fees, or fee arrangements, were—but that McDonald was misrepresenting the number of hours he worked. The District of Columbia Code of Professional Responsibility at the time also prohibited lawyers from engaging in "conduct involving dishonesty, fraud, deceit or misrepresentation." *Id.* DR 1-102(A)(4). But there is no evidence that McDonald actually engaged in such conduct. At most, Bohatch showed only that McDonald kept sloppy time records, not that he deceived his partners or clients. Neither his partners nor his major client accused McDonald of dishonesty, even after reviewing his bills and time records. Bohatch complains that Butler & Binion did not fully investigate McDonald's billing practices. Assuming Butler & Binion had some duty to investigate Bohatch's charges, it discharged that duty by determining that Pennzoil considered its bills reasonable. (The district court, as the court of appeals noted, excluded evidence that Paine and McDonald himself went so far as to report the charges against McDonald to the lawyer disciplinary authority, which exonerated him. 905 S.W.2d at 607.)

Even if expulsion of a partner for reporting unethical conduct might be a breach of fiduciary duty, expulsion for *mistakenly* reporting unethical conduct cannot be a breach of fiduciary duty. At the very least, a mistake so serious indicates a lack of judgment warranting expulsion. No one would argue that an attorney could not be expelled from a firm for a serious error in judgment about a client's affairs or even the firm's affairs. If Bohatch and McDonald had disagreed over what position to take in a particular case for Pennzoil, or over whether Butler & Binion

should continue to operate its Washington office, the firm could have determined that she should be expelled for the health of the firm, even if Bohatch had acted in complete good faith. Reporting unethical conduct where none existed is no different. If, as in *Gelder*, a partner can be expelled for being blunt, surely a partner can be expelled for a serious error in judgment.

Butler & Binion's expulsion of Bohatch did not discourage ethical conduct; it discouraged errors of judgment, which ought to be discouraged. Butler & Binion did not violate its fiduciary duty to Bohatch.

### III

I respond briefly to the Court's opinion and to the dissent.

### A

The Court seems to regard the proposition that "partners have no duty to remain partners", *ante* at 544, as determinative of Bohatch's damages claim for wrongful expulsion. It is true, of course, that any partner can withdraw from a partnership at any time. TEX.REV.CIV. STAT. ANN. art. 6132b-6.01 (Vernon Supp.1998) (formerly TEX.REV.CIV. STAT. ANN. art. 6132b, § 31 (Vernon 1970)). But it is not true that withdrawal and expulsion are always with impunity. *See* ALAN R. BROMBERG & LARRY E. RIBSTEIN, PARTNERSHIP §§ 7.02(c), 7.03(a) (1988). Bohatch does not argue in this case that she was entitled to remain a partner at Butler & Binion contrary to the will of a majority of her colleagues. She concedes they had the power to expel her but contends that they are liable for doing so in breach of their fiduciary duty to her.

The Court also misstates the issue when it says that "[t]he fiduciary duty that partners owe one another does not encompass a duty to remain partners." *Ante* at 546. The statement is correct, of course, but it has nothing to do with Bohatch's claim. The issue is not whether partners have a fiduciary duty to remain partners, but whether in choosing not to they can breach their fiduciary duty to one another. The cases I have cited indicate that partners cannot withdraw from a partnership or expel another partner solely to prevent a

556 ■

partner from obtaining the benefit of a financial opportunity that should have been the partnership's. *E.g. Leigh,* 608 N.E.2d at 1170; *Holman,* 522 P.2d at 523. That is not Bohatch's claim, but her claim is similar. She argues that Butler & Binion breached its fiduciary duty to her, not merely by expelling her, but by expelling her for reporting McDonald's unethical conduct.

The Court's claim that it is "sensitive" to the concerns of the amici curiae is belied by its failure even to understand those concerns. The amici plainly argue that "breach of fiduciary duty should be established if it can be shown that the expelling partner violated his ethical duties or that the expelled partner was terminated for complying with her ethical responsibilities." The Court never addresses this issue directly, holding only that people cannot be forced to remain partners. The Court makes no mention of the amici's breach of fiduciary duty argument. Nor does the Court address amici's concerns that failing to impose liability will discourage attorneys from reporting unethical conduct. The Court states only that its decision "in no way obviates the ethical duties of lawyers." Again, the statement is correct but irrelevant. The argument is that failing to punish retaliation for reporting ethics violations discourages such reporting because it leaves the reporting attorney without any defense to such retaliation. The concern is a legitimate one, but the Court simply ignores it.

It is no answer to say, as the Court does, that those who share this concern cannot convincingly explain how partners can share the trust requisite for a law firm (or at least some law firms) if they resent another partner for having "snitched" or "ratted on" another, as they might refer to the reporting of an ethical violation. Bohatch and the amici do not even attempt to explain away this practical reality. Still, the fact that their concerns raise others does not mean that their concerns are not real.

Finally, the Court mischaracterizes my position, just as it does the amici's arguments. It simply is not true that I "propose[ ] that a whistle blower be protected from expulsion, but only if the report, irrespective of being made in good faith, is proved to be correct." *Ante* at 547. As I have explained, I would not attempt to define when a law firm partner expelled for reporting unethical conduct can recover damages because I do not regard it as essential to the disposition of this case to do so. I would not hold that being correct is enough, only that being incorrect precludes recovery, at least in these circumstances. My criticism of the Court is not that another bright-line rule—one based on whether a report was correct—would be better, but that no bright-line rule should be adopted when the full ramifications of so broad a rule have not been adequately considered. It should come as no surprise to anyone that a lawyer can be fired for being incorrect, albeit in good faith. A lawyer can always be terminated for being incorrect about legal matters. It is, after all, a lawyer's judgment that is important, not her sincerity. Bohatch's charges were not merely an innocent mistake. They caused the expenditure of a significant amount of time in investigation, the report of possible overbilling to one of the firm's major clients, potentially jeopardizing that relationship, and an impossible strain on three lawyers working together on the same business for the same client in a small but important office of the firm.

Without offering a solution to the problems the amici raise, the Court adopts an absolute rule: a law firm that expels a partner for reporting ethics violations has no liability to the partner under any circumstances. The rule is ill-advised, particularly when it is far broader than necessary to address Bohatch's claims.

**B**

The dissent would hold that "law partners violate[ ] their fiduciary duty by retaliating against a fellow partner who ma[kes] a good-faith effort to alert her partners to the possible overbilling of a client." *Post* at 561. In fact, the dissent would adopt the broader proposition that a partner could not be expelled from a law firm for reporting any suspected ethical violation, regardless of how little evidence there might be for the suspicion:

Even if a report turns out to be mistaken or a client ultimately consents to the behavior in question, as in this case, retaliation against a partner who tries in good faith to correct or report perceived misconduct virtually assures that others will not take these appropriate steps in the future. Although I agree with the majority that partners have a right not to continue a partnership with someone against their will, they may still be liable for damages directly resulting from terminating that relationship.

*Post* at 561.

The dissent relies heavily on *Wieder v. Skala*, 80 N.Y.2d 628, 593 N.Y.S.2d 752, 609 N.E.2d 105 (1992). In that case, Wieder, an associate at a law firm, sued the firm for terminating him for insisting that the conduct of another associate, L.L., in representing Wieder himself as well as firm clients be reported to disciplinary authorities. L.L. "admitted in writing that he had committed 'several acts of legal malpractice and fraud and deceit upon [Wieder] and several other clients of the firm.'" *Id.* 593 N.Y.S.2d at 753, 609 N.E.2d at 106. The trial court dismissed the suit. The Court of Appeals held that Wieder was obliged by rules of conduct to report L.L. and that "by insisting that [Wieder] disregard [that obligation, the firm was] not only making it impossible for [Wieder] to fulfill his professional obligations but placing him in the position of having to choose between continued employment and his own potential suspension and disbarment." *Id.* 593 N.Y.S.2d at 756, 609 N.E.2d at 109. Thus, the court concluded that Wieder had stated a cause of action against the firm.

Obviously, *Wieder* did not involve a partnership relationship. More importantly the unethical conduct, and Wieder's duty to report it, were certain. The law firm insisted that to remain employed, Wieder had to violate rules of conduct by not reporting other admitted violations. Unlike L.L., McDonald not only denied unethical behavior, he was exonerated by his client and his partners. Unlike Wieder, Bohatch was expelled not because she insisted on reporting admitted unethical actions, but because she insisted on complaining of actions that were not unethical.

The dissent finds no support in any authority in any jurisdiction. Furthermore, the argument that allowing expulsion of a partner who incorrectly reports unethical conduct impairs Rule 8.03(a) of the Texas Disciplinary Rules of Professional Conduct is equally unfounded. That rule states in part that "a lawyer having knowledge that another lawyer has committed a violation of applicable rules of professional conduct that raises a substantial question as to that lawyer's honesty, trustworthiness or fitness as a lawyer in other respects, shall inform the appropriate disciplinary authority." TEX. DISCIPLINARY R. PROF'L CONDUCT 8.03(a), *reprinted in* TEX. GOV'T CODE ANN., tit. 2, subtit. G app. A (Vernon Supp.1997) (TEX. STATE BAR R. art. X, § 9). A lawyer's duty under this rule is only triggered by (1) knowledge of (2) a rules violation that (3) raises a substantial question about a lawyer's honesty, trustworthiness, or fitness. Bohatch's suspicions do not meet these requirements.

Even if they did, the dissent fails to make a convincing argument for liability in every situation in which a lawyer reports a suspected ethical violation. The dissent does not even acknowledge the tensions that would plainly arise between partners making and denying charges of unethical behavior. These tensions might easily prevent proper representation of clients. "[P]artners have a right not to continue a partnership with someone against their will," the dissent concedes, but if their will is based on a partner's assertions of unethical conduct, then they must pay to exert it. *Post* at 561. Not even lawyers should be forced to choose *in every instance* between maintaining an untenable partnership and paying for its termination over ethical disagreements however serious and sincere.

The dissent's reference to Twain to say that the "wages" of "right" and "wrong" in disagreements over ethics "is just the same" is clever, but it ignores the practicalities of maintaining a relationship of trust and confidence, and it glibly expresses a much too cynical view of the entire problem presented here. Acknowledging that some law partner-

ships cannot legitimately be expected to survive internecine quarrels over ethics simply does not spell the end of an attorney's responsibility to professional obligations and standards. Thus it is just not true, as the dissent asserts, that "this case sends an inappropriate signal to lawyers and to the public that the rules of professional responsibility are subordinate to a law firm's other interests." *Post* at 561. The matter is not so simple. A lawyer cannot simply enshroud any complaint against his colleagues in the mantle of obedience to rules of professional responsibility. The toll such a complaint makes is also important. The dissent's added charge that the result in this case "leave[s] an attorney who acts ethically and in good faith without recourse", *post* at 561, assumes incorrectly that the only "recourse" is an action for damages. Twain suggests that righteousness has its own rewards. The dissent argues that those rewards must be monetary to be real.

\* \* \* \* \*

I do not disagree with the Court's treatment of Bohatch's claim for breach of contract. Accordingly, I concur in the Court's judgment but not in its opinion.

SPECTOR, joined by PHILLIPS, Chief Justice, dissenting..

[W]hat's the use you learning to do right when it's troublesome to do right and ain't no trouble to do wrong, and the wages is just the same?

—*The Adventures of Huckleberry Finn*

The issue in this appeal is whether law partners violate a fiduciary duty by retaliating against one partner for questioning the billing practices of another partner. I would hold that partners violate their fiduciary duty to one another by punishing compliance with the Disciplinary Rules of Professional Conduct. Accordingly, I dissent.

## I.

This dispute arose after Colette Bohatch, a partner in Butler & Binion's Washington, D.C. office, expressed concerns to the firm's managing partner, Louis Paine, about possible overbilling by another partner, John McDonald. The firm had hired Bohatch to join McDonald as one of three attorneys in the firm's Washington office, which was devoted almost exclusively to Pennzoil matters. Bohatch had several years' experience working at the Federal Energy Regulatory Commission, ending her tenure there as Deputy Assistant General Counsel for Gas and Oil Litigation.

Once Bohatch became a partner in Butler & Binion, just over two years after being hired, she began receiving billing reports that indicated McDonald was charging Pennzoil for eight to twelve hours of work each day. Bohatch developed doubts about McDonald's billing practices after observing that he only worked an average of three to four hours per day.

She first expressed her suspicions about McDonald's billing practices to Richard Powers, the other partner in the Washington office, when he approached her with similar concerns. Together, Powers and Bohatch examined McDonald's time diary. They saw many vague entries that did not comply with firm requirements for keeping time records; Bohatch thought the records might have been falsified in an attempt to conceal overbilling. Powers told Bohatch that she should do something about her concerns.

Before reporting her suspicions, Bohatch reviewed the District of Columbia's ethical rules and consulted counsel. She ultimately met with Louis Paine, the firm's managing partner, to report that she suspected McDonald was overbilling Pennzoil on the level of $20,000 to $25,000 each month. Paine told Bohatch that she was right to report her concerns to him. Within a few hours, Bohatch informed Powers, upon his inquiry, that she had made a report to Paine.

The *day after* Bohatch made her report and immediately after an hour-long conversation with Powers, McDonald, the partner whose billing was in question, told Bohatch that Pennzoil had been dissatisfied with her work and that he would be supervising her future work. Bohatch testified that McDonald delivered this criticism with "red-faced anger." She also maintained that she

had never before heard any criticism of her work for Pennzoil. Bohatch phoned Paine that night and expressed fear that Mc-Donald's criticism was a response to her report. Within a few weeks, McDonald removed her from a pending Pennzoil case, reassigning it to an associate of one month's tenure, and barred her from taking on any new work for Pennzoil.

Within six weeks of Bohatch's initial report, Paine met with her and told her she should look for a new position. But the firm continued to provide her with a monthly draw, office space, and a secretary. Later, Bohatch's share in the distribution of the firm's profits was reduced to zero, and ultimately, her monthly draw was cut off. Bohatch eventually found new employment and filed this suit. Butler & Binion's partners then formally voted to terminate her from the partnership.

Bohatch contends that instead of properly investigating and responding to the allegations, McDonald, Paine, and the firm's management committee immediately began a retaliatory course of action that culminated in her expulsion from the partnership. The partners deny these claims.

Paine and another partner on the management committee, Hayden Burns, conducted an investigation of the overbilling allegations and testified at trial that they concluded the allegations were groundless. They maintain that Bohatch made her report for selfish or spiteful reasons, not out of a desire to fulfill her ethical responsibilities as a lawyer.

The jury heard Bohatch's and the firm's versions of the events and weighed the credibility of Bohatch, McDonald, Paine, and other witnesses. It returned a verdict in favor of Bohatch, finding that the defendants had failed to comply with the partnership agreement and had breached their fiduciary duty to Bohatch. The jury found that $57,000 would compensate Bohatch for lost earnings sustained before October 21, 1991 and $250,-

000 would compensate her for mental anguish suffered in the past. The jury also awarded $4 million in punitive damages against Paine, Burns, and McDonald. The punitive damages were substantially reduced on remittitur.

The court of appeals held that under the Texas Uniform Partnership Act and the common law, partners violate a fiduciary duty in expelling another partner only if they act in bad faith for self-gain. 905 S.W.2d 597, 602. It concluded that the record in this suit contains no evidence of a breach of fiduciary duty because there was no evidence that the partners expelled Bohatch for self-gain. *Id.* at 604. This Court, however, has never limited claims for a breach of fiduciary duty to circumstances in which a partner acts for self-gain. *See, e.g., Crim Truck & Tractor Co. v. Navistar Int'l Transp. Corp.,* 823 S.W.2d 591, 594 (Tex.1992). Today, the Court should have followed the advice of several leading legal scholars and disapproved of the court of appeals' opinion.[1] Instead, this Court, by affirming the court of appeals' judgment, discards the jury's conclusion that the partners violated their fiduciary duty.

## II.

The majority views the partnership relationship among lawyers as strictly business. I disagree. The practice of law is a profession first, then a business. Moreover, it is a self-regulated profession subject to the Rules promulgated by this Court.

As attorneys, we take an oath to "honestly demean [ourselves] in the practice of law; and ... discharge [our] duty to [our] *client[s]* to the best of [our] ability." TEX. GOV'T CODE § 82.037 (emphasis added). This oath of honesty and duty is not mere "self-adulatory bombast" but mandated by the Legislature. *See Schware v. Board of Bar Exam'rs,* 353 U.S. 232, 247, 77 S.Ct. 752,

---

1. Professors Richard L. Abel (University of California at Los Angeles School of Law), Leonard Gross (Southern Illinois University School of Law), Robert W. Hamilton (University of Texas School of Law), David J. Luban (University of Maryland School of Law), Gary Minda (Brooklyn Law School), Ronald D. Rotunda (University of Illinois College of Law), Theodore J. Schneyer (University of Arizona College of Law), Clyde W. Summers (University of Pennsylvania School of Law), and Charles W. Wolfram (Cornell Law School) offered their analyses as *amici curiae,* concluding that self-gain is not the sole element of a breach of fiduciary duty among partners.

760–761, 1 L.Ed.2d 796 (Frankfurter, J. concurring) (noting that the rhetoric used to describe the esteemed role of the legal profession has real meaning). As attorneys, we bear responsibilities to our clients and the bar itself that transcend ordinary business relationships.

Certain requirements imposed by the Rules have particular relevance in this case. Lawyers may not charge unconscionable fees. TEX. DISCIPLINARY R. PROF'L CONDUCT 1.04(a), *reprinted in* TEX. GOV'T CODE, tit. 2, subtit. G app. A (TEX. STATE BAR R. art. X, § 9); *see* D.C. R. PROF'L CONDUCT 1.5(a)(1) (West 1997).[2] Partners and supervisory attorneys have a duty to take reasonable remedial action to avoid or mitigate the consequences of known violations by other lawyers in their firm. TEX. DISCIPLINARY R. PROF'L CONDUCT 5.01; *see* D.C. R. PROF'L CONDUCT 5.1. Lawyers who know that another lawyer has violated a rule of professional conduct in a way that raises a substantial question as to that lawyer's honesty or fitness as a lawyer must report that violation. TEX. DISCIPLINARY R. PROF'L CONDUCT 8.03(a); D.C. R. PROF'L CONDUCT 8.3.[3] In Texas, Rules 5.01 and 8.03 are essential to the self-regulatory nature of the practice of law and the honor of our profession itself.

This Court has the exclusive authority to issue licenses to practice law. TEX. GOV'T CODE § 82.021. This Court also has the jurisdiction to discipline errant attorneys and establish procedures for doing so. *Id.* §§ 81.071, 81.072(a)-(c). Attorneys, whether they are sole practitioners, employees, or partners, are still "officers of the court." *In re Snyder,* 472 U.S. 634, 644, 105 S.Ct. 2874, 2880–2881, 86 L.Ed.2d 504 (1985) (quoting *People ex rel. Karlin v. Culkin,* 248 N.Y. 465, 162 N.E. 487, 489 (1928)); *Dow Chem. Co. v.*

Benton, 163 Tex. 477, 357 S.W.2d 565, 567 (1962).

In sum, attorneys organizing together to practice law are subject to a higher duty toward their clients and the public interest than those in other occupations. As a natural consequence, this duty affects the special relationship among lawyers who practice law together.

It is true that no high court has considered the issue of whether expulsion of a partner for complying with ethical rules violates law partners' fiduciary duty.[4] The dearth of authority in this area does not, however, diminish the significance of this case. Instead, the scarcity of guiding case law only heightens the importance of this Court's decision.

### III.

The few cases that provide guidance here do so with conflicting results, but each case highlights the grave implications of those decisions for a self-regulated profession. Ultimately, agreements to practice law may not by their terms or effect circumvent the ethical obligations of attorneys established by law. *See Southwestern Bell Tel. Co. v. De-Lanney,* 809 S.W.2d 493, 494 n. 1 (Tex.1991); *Central Educ. Agency v. George West Indep. Sch. Dist.,* 783 S.W.2d 200, 202 (Tex.1989).

### A.

In *Wieder v. Skala,* the New York Court of Appeals held in an at-will employment context that an associate terminated for reporting another associate's misconduct had a valid claim for breach of contract against his law firm based on an implied-in-law obligation to comply with the rules of the profession. 80 N.Y.2d 628, 593 N.Y.S.2d 752, 757, 609

---

**2.** Before January 1, 1991, the D.C. Bar's ethics rules were embodied by the Code of Professional Responsibility. Under the old code, DR 2–106 forbids excessive fees, as does the new Rule 1.5, and EC 1–4, DR 1–102(A)(2), and DR 1–103(A) require the reporting of ethical violations, as do the new Rules 5.1 and 8.3. Although the Code was in place during the majority of the D.C. events at issue in this case, the new Rules contain substantially the same provisions.

**3.** This rule is derived from the American Bar Association's Model Rules of Professional Con-

duct. As of 1993, the majority of jurisdictions, including the two at issue in this case, Texas and the District of Columbia, have adopted some version of the Model Rules. Anthony J. Blackwell, *Wieder's Paradox: Reporting Legal Misconduct in Law Firms,* 1992/1993 ANN. SURV. AM. L. 9, 25 n. 94 (1993).

**4.** None of the numerous partnership cases cited by the majority concern a law partner ousted for complying with the ethical rules of our profession. 977 S.W.2d at 546.

N.E.2d 105, 110 (1992). The court recognized that "[i]ntrinsic to [the hiring of an attorney to practice law] ... was the unstated but essential compact that in conducting the firm's legal practice both plaintiff and the firm would do so in compliance with the prevailing rules of conduct and ethical standards of the profession." *Id.* 593 N.Y.S.2d at 756–57, 609 N.E.2d at 109–10. To find otherwise would amount to "nothing less than a frustration of the only legitimate purpose of the employment relationship," *id.* 593 N.Y.S.2d at 757, 609 N.E.2d at 110, that is, "the lawful and ethical practice of law." *Id.* 593 N.Y.S.2d at 755, 609 N.E.2d at 108. *See also* Seymour Moskowitz, *Employment–at–Will and Codes of Ethics: The Professional's Dilemma,* 23 VAL. U.L.REV. 33, 56–66 (1988) (arguing for a public policy exception to at-will employment for professional codes of ethics). The plaintiff was not just an employee, but also an "independent officer[ ] of the court responsible in a broader public sense for [his] professional obligations." *Wieder,* 593 N.Y.S.2d at 755, 609 N.E.2d at 108.

Only one reported case involves an attorney who was punished solely for failing to report another lawyer's misconduct. The case is more notable for its rarity and effect than for the holding itself. The Illinois Supreme Court suspended an attorney for one year for failing to report misconduct pursuant to a settlement agreement forbidding reporting of unprivileged information about the conversion of client funds by another attorney. *In re Himmel,* 125 Ill.2d 531, 127 Ill.Dec. 708, 713, 533 N.E.2d 790, 795 (1988). Aware of the possible practical effect of its holding in setting an ethical standard for attorneys, the court found that "public discipline is necessary in this case to carry out the purposes of attorney discipline." *Id.* 127 Ill.Dec. at 713, 533 N.E.2d at 795. Together these cases illustrate that lawyers, by their agreements, may not sidestep their ethical obligations.

### B.

I believe that the fiduciary relationship among law partners should incorporate the rules of the profession promulgated by this Court. *See Central Educ. Agency,* 783 S.W.2d at 202 (noting that employment contracts incorporate existing law). Although the evidence put on by Bohatch is by no means conclusive, applying the proper presumptions of a no-evidence review, this trial testimony amounts to some evidence that Bohatch made a good-faith report of suspected overbilling in an effort to comply with her professional duty. Further, it provides some evidence that the partners of Butler & Binion began a retaliatory course of action *before* any investigation of the allegation had begun.

In light of this Court's role in setting standards to govern attorneys' conduct, it is particularly inappropriate for the Court to deny recourse to attorneys wronged for adhering to the Disciplinary Rules. *See* Blackwell, *supra,* at 44–48. I would hold that in this case the law partners violated their fiduciary duty by retaliating against a fellow partner who made a good-faith effort to alert her partners to the possible overbilling of a client.

### C.

The duty to prevent overbilling and other misconduct exists for the protection of the client. Even if a report turns out to be mistaken or a client ultimately consents to the behavior in question, as in this case, retaliation against a partner who tries in good faith to correct or report perceived misconduct virtually assures that others will not take these appropriate steps in the future. Although I agree with the majority that partners have a right not to continue a partnership with someone against their will, they may still be liable for damages directly resulting from terminating that relationship. *See Woodruff v. Bryant,* 558 S.W.2d 535, 539 (Tex.Civ.App.—Corpus Christi 1977, writ ref'd n.r.e.).

### III.

The Court's writing in this case sends an inappropriate signal to lawyers and to the public that the rules of professional responsibility are subordinate to a law firm's other interests. Under the majority opinion's vision for the legal profession, the wages would not even be the same for "doing right"; they

diminish considerably and leave an attorney who acts ethically and in good faith without recourse. Accordingly, I respectfully dissent.